IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

C2R Global Manufacturing, Inc.,              Case No. 18-30182-beh

Debtor.                                       Chapter 11

## DECISION AND ORDER ON VERDE ENVIRONMENTAL TECHNOLOGIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Verde Environmental Technologies, Inc. and the debtor, C2R Global Manufacturing, Inc., are direct competitors in the drug disposal product market. Verde manufactures and sells a product called the Deterra Drug Deactivation System, while C2R offers a line of drug disposal products under the name "Rx Destroyer." Verde alleges that C2R has engaged in false advertising under the Lanham Act by advertising that its products have the capacity to deactivate specific volumes of medication placed in the product through adsorption to activated carbon, and that the products do not (and cannot) perform as represented.

Verde has moved for partial summary judgment on the limited issue of whether C2R's "capacity" representations are literally false. In opposing Verde's motion, C2R asks the Court to grant summary judgment in C2R's favor as to the literal falsity of *other* advertisements outside the scope of Verde's narrow request. For the reasons that follow, the Court will grant in part and deny in part Verde's motion for partial summary judgment. C2R's request for summary judgment in its favor as to the literal falsity of other representations will be addressed in a separate decision.

### PROCEDURAL BACKGROUND AND JURISDICTION

C2R commenced this Chapter 11 bankruptcy case in October 2018. Several months before that, in March 2018, Verde filed a lawsuit against C2R

in the Eastern District of Wisconsin, asserting claims for patent infringement and false advertising (under both the Lanham Act, 15 U.S.C. § 1125(a), and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18). The district court litigation was stayed after the debtor filed for bankruptcy relief.

Verde filed a proof of claim in this case for over $6 million in money damages, based on the same causes of action asserted in its district court complaint. C2R objected to Verde's proof of claim, denying liability. The parties since have settled their patent infringement dispute, and Verde has withdrawn its reliance on the Wisconsin Deceptive Trade Practices Act, so only Verde's Lanham Act claim remains.[1]

Because this dispute concerns the allowance or disallowance of claims, this is a core proceeding under 28 U.S.C. § 157(b)(2)(B). The Court has jurisdiction under 28 U.S.C. § 1334 and the Eastern District of Wisconsin's July 16, 1984, order of reference entered under 28 U.S.C. § 157(a). To the extent that the issues may be deemed non-core but otherwise relate to the debtor's bankruptcy case, the parties have given their implicit consent to the entry of appropriate orders and judgments by the bankruptcy judge.

**FACTS**

The Court has reviewed each party's statement of proposed material facts and corresponding responses, and has credited each fact to the extent it has been admitted or is supported by admissible evidence, with genuine disputes resolved in favor of C2R as the nonmovant. With the foregoing in mind, the record reveals the following facts as being material to the dispute at hand.

**A.     The Parties**

Verde is a Minnesota-based corporation that claims to develop "research-based, scientifically proven solutions to reduce drug abuse, misuse, and

---

[1] Verde also has filed an adversary proceeding against C2R alleging the same Lanham Act violations, but seeking a permanent injunction rather than a determination of money damages. *See* Adv. No. 20-02028.

negative environmental impact." *See* ECF Doc. No. 49, at 7, 40.[2] One of Verde's products is the Deterra Drug Deactivation System ("Deterra"). According to Verde, Deterra deactivates prescription drugs using a proprietary and patented activated carbon technology. *Id.* at 40.

C2R, a Wisconsin corporation, is one of Verde's competitors. C2R manufactures and sells a line of drug disposal products under the name "Rx Destroyer." The Rx Destroyer products also contain activated carbon, plus a liquid solution.

**B.     Drug Buster: C2R's first foray into the drug disposal product market**

C2R entered the drug disposal market in 2011, as a contract manufacturer of drug disposal and deactivation products sold under the name "Drug Buster." *See* Verde's SPMF ¶ 1[3]; Verde's SPMF ¶ 2; C2R's APMF ¶ 6.[4] C2R licensed the Drug Buster product from Sherry Day, a nurse who invented and procured a patent purportedly covering the product. *See* ECF Doc. No. 353-10 ("Wilbert Decl. Ex. 10"), Dallas Dep. at 25:10–26:24 (cited in C2R's APMF ¶ 7); *see also* AP-ECF Doc. No. 35 (C2R's Answer to Verde's Complaint), ¶ 24.

The Drug Buster product came in at least the following sizes: 4 oz., 16 oz., and 64 oz. *See* ECF Doc. No. 262 at 221–235 ("First Lorentz Decl. Ex. 14"). C2R represented the capacity of the various-sized Drug Buster products as follows: for the 4 oz. product, approximately 50 pills; for the 16 oz. product, approximately 300 pills; and for the 64 oz. product, approximately 1,500 pills. *See* Verde's SPMF ¶ 23; C2R's RPMF ¶ 23[5]; First Lorentz Decl. Ex. 14, at 222–23; ECF Doc. No. 353-1 ("First Lorentz Decl. Ex. 1"), Dallas Dep. at 66:13–18,

---

[2] Citations to the docket in this bankruptcy case, Case No. 18-30182-beh, are noted by "ECF Doc. No." Citations to the docket in the related adversary proceeding, Adv. No. 20-02028-beh, are noted by "AP-ECF Doc. No."

[3] "Verde's SPMF" means Verde's Statement of Proposed Material Facts, with a public, redacted version filed at ECF Doc. No. 353-4.

[4] "C2R's APMF" means C2R's Statement of Additional [Proposed] Material Facts, with a public, redacted version filed at ECF Doc. No. 353-7.

[5] "C2R's RPMF" means C2R's Response to Verde's Statement of Proposed Material Facts, with a public, redacted version filed at ECF Doc. No. 353-6.

67:10–68:7. It was Ms. Day who determined the capacities for the Drug Buster products and communicated them to C2R. *See* AP-ECF Doc. No. 35, ¶ 25.

## C.    The Rx Destroyer

In 2014, C2R launched its own line of drug disposal products—the products at issue in this litigation—under the name "Rx Destroyer." *See* Verde's SPMF ¶ 3. The products currently offered in C2R's Rx Destroyer line include, without limitation, the following:

- Rx Destroyer™ All-Purpose 5.0 Gallon Container
- Rx Destroyer™ All-Purpose 2.5 Gallon Bottle
- Rx Destroyer™ Pro-Series All-Purpose 1.0 Gallon Bottle
- Rx Destroyer™ Pro-Series All-Purpose 64 oz. Bottle
- Rx Destroyer™ All-Purpose 64 oz. Bottle
- Rx Destroyer™ All-Purpose 16 oz. Bottle
- Rx Destroyer™ All-Purpose 4 oz. Bottle

*See* Verde's SPMF ¶ 4, incorporating, as relevant, C2R's RPMF ¶ 4. C2R markets these products on its website, RxDestroyer.com.

C2R also sells what it describes as a "high-capacity version" of Rx Destroyer, NarcGone. NarcGone is identical to Rx Destroyer, but includes an additional 25% activated carbon. *See* C2R's APMF ¶¶ 28, 56.

### 1.    How Rx Destroyer works

Rx Destroyer products consist of two active ingredients—(1) an aqueous (and slightly acidic) solution and (2) activated carbon—in a sealed plastic container. C2R has described the product line as follows on the Rx Destroyer website:

- System contains patented solution that begins dissolving medications on contact. Active medication ingredients are adsorbed or neutralized by activated charcoal. Adsorption time varies depending on additive and existing contents.
- Each container contains a carefully formulated balance of ingredients that will destroy to medication capacity.
- Rx Destroyer™ patented formula controls:
    - Fast dissolving formulation breaks medications down quickly

- Specialty formulated activated carbon process allow[s] for increased capacity
- Container system automatically controls internal pressure

*See* ECF Doc. No. 262 at 11–14 ("First Lorentz Decl. Ex. 4") (cited in Verde's SPMF ¶ 19 and C2R's RPMF ¶ 19). According to another advertisement:

> Q: How does Rx Destroyer™ pharmaceutical disposal system work?
>
> A: Rx Destroyer™ patented formula begin[s] dissolving medications on contact. As medications are dispersed the activated carbon adsorbs them rendering them useless for abuse. . . .
>
> Follow link for additional information and test reports.[6]

ECF Doc. No. 262 at 18–27 ("First Lorentz Decl. Ex. 6") (cited in Verde's SPMF ¶ 20).[7]

Milton Dallas, a founder and co-principal of C2R, characterized the aqueous solution in the Rx Destroyer products as a "transfer agent" that allows the activated carbon to "accept" the medication. *See* First Lorentz Decl. Ex. 1, Dallas Dep. at 88:1–89:7 (cited in Verde's SPMF ¶ 21 and C2R's RPMF ¶ 21). Dallas testified that the solution is necessary for the Rx Destroyer products to work—"[a]ctivated carbon by itself, a dry activated carbon, does not neutralize anything"—and that the solution alone does not deactivate or destroy medication. *See id.* ("Q: [T]he solutions don't deactivate or destroy medications

---

[6] According to C2R, this link directed users to materials available on the "Test Data" page of the Rx Destroyer website, which contained (and still contains) hyperlinks to memoranda authored by Dr. Henry Nowicki, discussed *infra* Section E.1. C2R's APMF ¶¶ 67–68; *see also* C2R's APMF ¶ 1.

[7] C2R purports to dispute Verde's SPMF ¶ 20—which states that C2R poses three questions and answers on the "Frequently Asked Questions" section of its webpage, including the Q&A above—on the basis that the statement is incomplete. *See* C2R's RPMF ¶ 20 ("The Frequently Asked Questions section of the Rx Destroyer™ website contains numerous other questions and answers—31 in total including the three questions and answers excerpted above. . . In addition, the answers excerpted above contain links to test data also displayed on the Rx Destroyer™ [website] that further explain the answers provided."). But without evidence that C2R's customers necessarily would read the advertisements in the larger context proposed by C2R, including with the corresponding "test data" cited in certain answers as a means to inform the reading of *other* Q&As, the Court accepts the representations highlighted in Verde's SPMF ¶ 20 as sufficient for analysis under the literal falsity rubric. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) ("While the court should consider context, it may not *assume* context.").

themself; correct? A: Our particular aqueous solution does not. . . . Just the liquids in itself does not. It's a transfer agent.").

C2R's litigation expert, Dr. David Mazyck, disagrees with Dallas's description, and opines that the solution itself works to deactivate medication, *see infra* Section E.4.

### 2. What Rx Destroyer does

C2R's advertisements claim that the Rx Destroyer "destroys" and "[d]issolves, adsorbs, and neutralizes" medications. *See* First Lorentz Decl. Ex. 4 ("Each container contains a carefully formulated balance of ingredients that will destroy to medication capacity."); ECF Doc. No. 371, at 3 ("First Lorentz Decl. Ex. 2") (stating that the Rx Destroyer line "[d]issolves[,] adsorbs[,] and neutralizes non-hazardous medications (controlled & non-controlled substances)"); ECF Doc. No. 353-2 ("First Lorentz Decl. Ex. 7") (same); ECF Doc. No. 371, at 5 ("First Lorentz Decl. Ex. 8") (same).

One of the stated purposes of the Rx Destroyer products is to prevent drug abuse and diversion. On the "Q&A" section of its website, C2R has advertised how the Rx Destroyer achieves that goal:

Q: Can drugs be abused after placing in Rx Destroyer™?

A1: NO. "drug [is] NOT retrievable, because it is chemically bound in the activated carbon's pores. It takes commercial reactivation, furnace at 1700° to restore carbon. Their boiling points are too high for desorption without breaking bonds, so the drugs will never leave the pores as the whole and thus once adsorbed and the carbon bed is drained, there is no mechanism for the drugs to leave the pores as the original molecule." At this red heat adsorbate drugs are mineralized to carbon dioxide water.

Follow link for additional information and test reports.[8]

First Lorentz Decl. Ex. 6, at 21 (cited in Verde's SPMF ¶ 20);[9] *see also id.* at 19 ("As medications are dispersed the activated carbon adsorbs them rendering them chemically useless for abuse.").

---

[8] *See supra* note 6.

[9] *See supra* note 7.

C2R also advertises that its Rx Destroyer products meet the Drug Enforcement Administration's "non-retrievable" standard:

> Q: Does Rx Destroyer™ pharmaceutical meet DEA disposal standards?
>
> A: YES. Medications are adsorbed to carbon which are subsequently scientifically irretrievable. Patent[ed] formula meets DEA regulations for destruction of controlled substances by deeming "non-retrievable".

First Lorentz Decl. Ex. 6, at 21 (cited in Verde's SPMF ¶ 20).[10] The DEA defines "non-retrievable" as follows:

> Non-retrievable means, for the purpose of destruction, the condition or state to which a controlled substance shall be rendered following a process that permanently alters that controlled substance's physical or chemical condition or state through irreversible means and thereby renders the controlled substance unavailable and unusable for all practical purposes. The process to achieve a non-retrievable condition or state may be unique to a substance's chemical or physical properties. A controlled substance is considered "non-retrievable" when it cannot be transformed to a physical or chemical condition or state as a controlled substance or controlled substance analogue. The purpose of destruction is to render the controlled substance(s) to a non-retrievable state and thus prevent diversion of any such substance to illicit purposes.

21 C.F.R. § 1300.05(b).

## D. C2R's numerical capacity representations

When C2R introduced its 4 oz., 16 oz., and 64 oz. Rx Destroyer products in 2014, its representations as to capacity for those products were the same as the capacity representations for the Drug Buster products (~ 50 pills, ~ 300 pills, and ~ 1,500 pills, respectively). *See* Verde's SPMF ¶ 23, incorporating C2R's RPMF ¶ 23; First Lorentz Decl. Ex. 1, Dallas Dep. at 66:13–18, 67:10–68:7.

---

[10] *See supra* note 7.

C2R advertised the capacity of its Rx Destroyer products on its website, at least prior to April 2020,[11] as follows:

> Q: What is the capacity of Rx Destroyer™ All–Purpose?
>
> A1: 4 ounce can hold approximately 50 pills
> A2: 16 ounce can hold approximately 300 pills
> A3: 64 ounce can hold approximately 1,500 pills
> A4: 1 Gallon can hold approximately 3,000 pills
> A5: 2.5 Gallon can hold approximately 7,500 pills
> A6: 5 Gallon can hold approximately 15,000 pills
> A7: 30 Gallon can hold approximately 90,000 pills
>
> Notes:
> 1) Capacity based upon 200mg Advil™ tablet
> 2) Calculations based upon filling container to within 2" of opening
> 3) Additional fluid variance between sizes due to bottle profile
> 4) Capacity will vary if solids are introduced

First Lorentz Decl. Ex. 6, at 25 (cited in Verde's SPMF ¶ 11).[12]

**CAPACITY BY PRODUCT**

- 5 Gallon: holds approximately 15,000 pills/patches or 500 additional oz. of liquid
- 2.5 Gallon: holds approximately 7,500 pills/patches or 160oz. of liquid
- 1 Gallon: holds approximately 3000 pills/patches or 64oz of liquid
- 64oz: holds approximately 1500 pills/patches or 32oz of liquid
- 16oz: holds approximately 300 pills/patches or 8oz of liquid

ECF Doc. No. 262, at 32–35 ("First Lorentz Decl. Ex. 9") (cited in Verde's SPMF ¶ 14).[13]

---

[11] In early April 2020, C2R performed a website redesign during which it revised a number of the Rx Destroyer website's pages and removed its numerical capacity representations. *See* Verde's SPMF ¶ 18; C2R's RPMF ¶ 18.

[12] C2R purports to dispute Verde's SPMF ¶ 11 ("The Frequently Asked Question Section of C2R's website described the capacity as follows: [above screenshot].") on the bases that (1) the Rx Destroyer website *no longer* contains the above representations, which were removed as part of the April 2020 website redesign; (2) the excerpt is a "small portion outside of the context of the larger material and full context of C2R's advertising"; and (3) "many of C2R's advertisements do not identify pill size or medi[c]ation type." C2R's RPMF ¶ 11. C2R's response, and the materials cited in support, do not controvert the limited statement proposed by Verde.

[13] C2R purports to dispute Verde's SPMF ¶ 14 ("C2R made similar representations on its online website: [above screenshot].") on the bases that (1) the excerpt "is a small portion outside of the context of the larger website and full context of C2R's advertising"; and (2) the website currently does not advertise the capacity of the Rx Destroyer products. C2R's RPMF ¶ 14. C2R's response, and the materials cited in support, do not controvert the limited statement proposed by Verde.

C2R similarly advertised its product capacity in printed advertisements and promotional materials. For example, C2R made the following representations in one of its Rx Destroyer advertisements:



Verde's SPMF ¶ 12.[14] In other of its Rx Destroyer advertisements, C2R likewise represented that the Rx Destroyer All-Purpose product line "[d]issolves, adsorbs, and neutralizes non-hazardous medications (controlled & non-controlled substances)" and indicated capacity as follows:

Rx Destroyer™ All-Purpose · 5.0 Gallon Container (15,000 pills)
Rx Destroyer™ All-Purpose · 2.5 Gallon Bottles (7500 pills/bottle)
Rx Destroyer™ All-Purpose · 1 Gallon Bottles (3000 pills/bottle)
Rx Destroyer™ All-Purpose · 64 oz Bottles (1500 pills/bottle)
Rx Destroyer™ All-Purpose · 16 oz Bottles (300 pills/bottle)
Rx Destroyer™ All-Purpose · 4 oz Bottles (50 pills/bottle)

*See* First Lorentz Decl. Ex. 7 (included in this advertisement is a note at the top right corner: **Medication disposal capacity is approximate**); First Lorentz Decl. Ex. 8 (included in this advertisement is small notation near the top of the page: "NOTE: Drug volumes are approximate. Dosage forms will vary and affect volumes.") (cited in Verde's SPMF ¶ 13).[15]

---

[14] C2R purports to dispute Verde's SPMF ¶ 12 on the bases that (1) the excerpt "is a small portion outside of the context of the larger material and full context of C2R's advertising"; and (2) "often when C2R distributed the above referenced overview of its Rx Destroyer Products, it distributed it coupled with memos and studies from Dr. Nowicki including a capacity study by Dr. Nowicki that explains that the pill capacity is based on pills with 5 mg and 30 mg of drugs." C2R's RPMF ¶ 12. C2R's response, and the materials cited in support, do not controvert the limited statement proposed by Verde.

[15] C2R purports to dispute Verde's SPMF ¶ 13, which states that C2R made the representations above in one of its Rx Destroyer advertisements, on the same bases set forth in the prior footnote. The Court does not find C2R's response to create a genuine dispute, for the same reasons previously identified.

In other promotional materials, C2R advertised medication volume by directly referring to the products' "pharmaceutical disposal capacity":



Verde's SPMF ¶ 15 (citing ECF Doc. No. 262, at 37–69 ("First Lorentz Decl. Ex. 10"), at WILLE117689).

### E. Scientific Testing and Analyses of the Rx Destroyer

#### 1. Dr. Henry Nowicki's Analyses

In early 2015, C2R hired Dr. Henry Nowicki to evaluate its products. Verde's SPMF ¶ 29. Dr. Nowicki was an activated carbon expert and well known for his laboratory, PACS labs. C2R's APMF ¶ 13.

Dr. Nowicki first analyzed the carbon purportedly contained within the Rx Destroyer products, using the Gravimetric Adsorption Energy Distribution (GAED) method. C2R's APMF ¶ 18; *see also* ECF Doc. No. 278-18 ("Wilbert Decl. Ex. 18"); ECF Doc. No. 278-38 ("Wilbert Decl. Ex. 38"). The GAED method experimentally analyzes the structure of a specific carbon and then uses the results to calculate the adsorption capacity of that specific carbon. C2R's APMF ¶ 19. The test is commercially available and used throughout the activated carbon industry. C2R's APMF ¶ 20.

Dr. Nowicki relayed the results of his GAED testing to C2R in a memorandum dated February 19, 2015, with the subject line: "GAED test summary of activated carbon used in Rx Destroyer™." Wilbert Decl. Ex. 18. In this report, Dr. Nowicki concluded, based on the GAED test results and his application of the Michael Polanyi Equation for physical adsorption energy,

that the Rx Destroyer "is designed to provide enough pore volume to provide complete adsorption and thus non-retrievable drugs destruction for practical purposes." *Id.* In this same memorandum, Dr. Nowicki reported that he had "review[ed] studies by Dr. David Cooney, Dr. [William] Fowler, Dr. Signid Peldszusl and Dr. Bert McCarty, involving studies that result in the physical adsorption of active medication ingredients by activated carbon," and reasoned that there was "no need to reproduce these results and the data in these studies can be applied to the activated carbon [used in the Rx Destroyer]. Due to the enormous numbers of present medications in the marketplace and new drug developments, it would not be practical to test the adsorption capacity and rate of adsorption for each specific drug." *Id.*

In April 2015, Dr. Nowicki expanded on his prior analysis, as reflected in a second report to C2R, dated April 29, 2015, with the subject line: "Provide analysis of Rx Destroyer drug capacity per bottle size to support claims of DEA non-retrievable standard." ECF Doc. No. 278-39 ("Wilbert Decl. Ex. 39").[16] According to this second memorandum, Nowicki used the data from his GAED test results, as well as assumptions concerning the carbon content of each Rx Destroyer container,[17] to calculate "the adsorption space or pore volumes for drug physical adsorption capacities in Rx Destroyer bottle sizes." Wilbert Decl. Ex. 39. The greater the pore space of activated carbon, the greater the area available to take up drugs from a solution. Verde's SPMF ¶ 35. If there is not enough pore space, not all of the drugs can be adsorbed. Verde's SPMF ¶ 36.

---

[16] C2R's internal emails reveal that Dr. Nowicki prepared this memorandum after C2R requested that he do so in response to a customer inquiry about the capacity representations on C2R's website. ECF Doc. No. 372, at 14–15 ("Second Lorentz Decl. Ex. 6").

[17] According to the evidence of record, Dr. Nowicki's assumptions about the carbon content of each Rx Destroyer bottle were based on what C2R represented to him as the carbon content of its products. *Id.*; *see also* ECF Doc. No. 372, at 17–21 ("Second Lorentz Decl. Ex. 7"); ECF Doc. No. 372, at 23–27 ("Second Lorentz Decl. Ex. 8").

Dr. Nowicki calculated the adsorption space for the 4 oz., 16 oz., 64 oz., and 2.5 gallon bottles as follows:

| Rx Destroyer Bottle Sizes | Pore Volume cc by Bottle Size for Drugs Adsorption |
|---|---|
| Rx 4 | 12.75 |
| Rx 16 | 30.58 |
| Rx 64 | 112.14 |
| Rx 2.5 | 560.51 |

Wilbert Decl. Ex. 39; *see also* Verde's SPMF ¶¶ 30–31; C2R's RPMF ¶¶ 30–31. Based on the above calculations of adsorptive pore volume for the identified Rx Destroyer bottle sizes, and Dr. Nowicki's "conservative" estimate that 1 cc of pore space could adsorb 1 gram of drug, Dr. Nowicki concluded "that each bottle size has enough capacity to cover claims, and have an ample safety margin"—at least for treating pills with 5 mg or 30 mg of active drug. Dr. Nowicki explained:

Capacity issue, for example in the Rx 64, there is 112.14 cc adsorption space or pore volume for drug adsorption. If 1500 pills with 5 mg or 30 mg active drug per pill then we challenge the carbon pore volume with: 7.5- or, 45-grams of active drug. Drugs of interest have a packed condensed density more than 1.0 g per cc, a conservative value. Thus, to satisfy the two 5- and 30-milligram pills example we need 7.5-, 45- cc of pore volume for complete adsorption. Since we have 112.14 cc of workable pore volume, we have an excess available pore volume of 67 cc at the highest example of active drug in each pill, using conservative drug packed density.

Wilbert Decl. Ex. 39; *see also* Verde's SPMF ¶¶ 30–31, 38; C2R's RPMF ¶¶ 30–31, 38.

The record in this case reveals that, in calculating the adsorptive pore volume of the various sizes of the Rx Destroyer containers, Dr. Nowicki assumed that the products contained more activated carbon than they actually do. Verde's SPMF ¶ 33.[18]

Dr. Nowicki's February 19 and April 29, 2015 memoranda are available on C2R's website, at the "Test Data" page, at https://www.rxdestroyer.com/test-data/. *See* C2R's APMF ¶ 67.

---

[18] C2R purports to dispute this fact by asserting that "[i]t is unclear whether Dr. Nowicki's identification of ounces was referencing ounces by mass or ounces by volume (i.e., fluid ounces)." *See* C2R's RPMF ¶ 33, 39. This suggested factual dispute, however, is directly refuted by other evidence in the record. *See* Second Lorentz Decl. Exs. 7 and 8.

Prior to the Rx Destroyer website redesign in April 2020, the "Test Data" page also contained a document labeled as "Appendix C," which describes the results of a study that Dr. Nowicki reviewed. *See* Verde's SPMF ¶ 16; C2R's RPMF ¶¶ 16–17. This document begins by stating: "Dr. Henry Nowicki, PACS, reviewed the information below entitled 'Independent Activated Carbon Study'. He recommended that the test results can be applied to the activated carbon used in the Rx Destroyer and there is no need to recreate the study." ECF Doc. No. 278-48 ("Wilbert Decl. Ex. 48"). The document references a study that included a medical literature search for activated carbon, describes some of the applications for activated carbon, and then includes a chart that purportedly compares the deactivation effectiveness of the Rx Destroyer to deactivation by coffee grounds, cat litter, and sawdust for a number of compounds:

| Comparison Test for Percent of Drug Deactivated | | | | |
|---|---|---|---|---|
| | Rx Destroyer | Coffee Grounds | Cat Litter | Sawdust |
| Generic Vicodin, 10/325 | 99.6 | 0 | 0 | 0 |
| Generic Percocet, 5/325 | 100 | 5.3 | 0 | 0 |
| Naproxen, 220 mg | 99.4 | 0.9 | 0 | 0 |
| Ibuprofen, 200 mg | 94.3 | 0 | 0 | 0 |
| Diphenhydramine, 25 mg | 99.8 | 49.2 | 83.6 | 67.7 |
| Dexamethasone, 4 mg | 99.2 | 3.5 | 34.8 | 67.5 |
| Amoxicillin, 250 mg | 97.5 | 10.8 | 0 | 7.9 |
| Effexor XR, 75 mg | 98.9 | 38.8 | 87.4 | 59.3 |
| Ketoprofen, 75 mg | 99.9 | 35.6 | 23.6 | 47.2 |
| Average | 98.7 | 16.0 | 25.5 | 27.7 |
| Standard Deviation | 1.8 | 19.5 | 36.3 | 31.7 |

*Id.*

### 2. Dr. Worthen's Criticism of Dr. Nowicki's Analyses

After commencing litigation, Verde retained Dr. David Worthen, a scientist with experience in pharmaceuticals, as an expert. Dr. Worthen did not physically test the Rx Destroyer products, but instead was asked to review the materials identified by C2R as supporting its capacity representations,

including Dr. Nowicki's memos.[19] *See* C2R's APMF ¶ 62. Dr. Worthen concluded that the documents do not provide a reasonable basis for C2R's capacity claims. Verde's SPMF ¶ 25. Among other things, Dr. Worthen criticized Dr. Nowicki's analyses as being purely theoretical and making "unreasonable assumptions relating to table[t] size, tablet content, and adsorption science." First Lorentz Decl. Ex. 23, Worthen Decl. ¶ 17. According to Dr. Worthen, "Dr. Nowicki's analyses, including his extrapolation analyses, suggest that RxDestroyer's activated carbon would be overwhelmed, under advertised and foreseeable use." *Id.*[20]

### 3.    Mr. Fowler's Testing

Between June 2014 and July 2019, William Fowler, Verde's Director of Research and Development, conducted multiple tests of C2R's Rx Destroyer products. *See* ECF Doc. No. 262 at 547–592 ("First Lorentz Decl. Ex. 25"), Fowler Decl. ¶¶ 3–20 (cited in Verde's SPMF ¶ 40). Those tests involved filling different sizes of Rx Destroyer containers with varying amounts of a single drug, including naproxen (220 mg), acetaminophen (500 mg), Advil (200 mg), quetiapine (100 mg), tramadol (50 mg), and meperidine (50 mg). *Id.* Based on his testing and observations, Mr. Fowler "experimentally concluded that Rx

---

[19] The other documents Dr. Worthen reviewed include additional studies, also apparently reviewed by Dr. Nowicki: (1) an undated report titled "Activated Charcoal for Pesticide Deactivation" by Dr. Bert McCarty; (2) a 2004 paper entitled "Quinclorac: Soil Behavior and Foliar vs. Root Absorption by Torpedograss"; and (3) a one-page chart entitled "Short List of Chemicals Adsorbed by Activated Charcoal" and purportedly derived from a book authored by Dr. David Cooney. ECF Doc. No. 262 at 438–530 ("First Lorentz Decl. Ex. 23"), Worthen Decl. ¶ 13. Dr. Worthen describes these materials as "activated carbon related references showing that activated carbon can be employed, in various capacities, to adsorb certain materials, to some degree, under certain circumstances, when applied or used in a certain amount, to certain surfaces," but "provide no information about the capacity of RxDestroyer's products." *Id.* at ¶ 15.

[20] For example, Dr. Nowicki calculated that a 64 oz. Rx Destroyer bottle contains 112.14 cc of carbon pore volume, and thus can deactivate 112.14 grams of drug. *Id.* at ¶ 51; *see also* Wilbert Decl. Ex. 39. But, as Dr. Worthen points out, if a 64 oz. Rx Destroyer bottle is filled to capacity with 1,500 tablets of the pain reliever Norco (each of which contain 5 mg of hydrocodone bitartrate and 325 mg of acetaminophen), the total amount of drug to be deactivated would be more than four times that amount, at 495 grams (7.5 grams of hydrocodone bitartrate and 487.5 grams of acetaminophen). First Lorentz Decl. Ex. 23, ¶ 52–53.

Destroyer's products are incapable of deactivating medications up to their capacity claims." Lorentz Decl. Ex. 25, Fowler Decl. ¶ 20.

### 4. Dr. Mazyck's Testing

After Verde initiated litigation, C2R retained another activated carbon expert, Dr. David Mazyck, to conduct independent testing of the Rx Destroyer products. Relevant here, Dr. Mazyck's experiments on the Rx Destroyer's ability to deactivate different kinds of medication showed the following results:

- Dr. Mazyck's testing of 300 Advil pills (200 mg) in an Rx Destroyer 16 oz. showed that 12% remained after 30 days. Verde's SPMF ¶ 45.

- Dr. Mazyck's testing of 300 Advil pills (200 mg) in an Rx Destroyer 16 oz. showed that 9% remained after 141 days. Verde's SPMF ¶ 47;[21] *see also* C2R's APMF ¶ 35.

- Dr. Mazyck's testing of 300 generic ibuprofen (200 mg) in an Rx Destroyer 16 oz. showed that 21% remained after 5 days, and 10% remained after 75 days. Verde's SPMF ¶ 48; *see also* C2R's APMF ¶ 34.

- Dr. Mazyck's testing of 300 Sudafed pills (10 mg) in an Rx Destroyer 16 oz. showed that 41% remained after 30 days. Verde's SPMF ¶ 49.

- Dr. Mazyck's testing of 300 Claritin pills (5 mg) in an Rx Destroyer 16 oz. showed that 32% remained after 15 days. Verde's SPMF ¶ 50.

Dr. Mazyck also reports having conducted a test on a 16 oz. Rx Destroyer bottle using the Toxicity Characteristic Leaching Procedure (TCLP). C2R's APMF ¶ 33. The TCLP test was created by the Environmental Protection Agency to determine whether chemicals will leach through a landfill, with the intent of identifying 40 specific contaminants set forth in 40 C.F.R. § 261.24. *See* C2R's APMF ¶ 29; Verde's RPMF ¶ 29.[22] The EPA's TCLP test is a specific testing protocol containing defined steps and methods. C2R's APMF ¶ 31. Dr. Mazyck states that he performed the TCLP procedure on a 16 oz. Rx Destroyer

---

[21] Although Verde's proposed fact, which C2R does not dispute, states that Dr. Mazyck's testing showed that 9% remained after **7** days, the document that Verde cites in support of its proposed fact, as well as Dr. Mazyck's report, reflect that the sample described in this fact was tested after 141 days, not 7.

[22] "Verde's RPMF" means Verde's Response to C2R's Statement of Additional [Proposed] Material Facts, with a public, redacted version filed at ECF Doc. No. 353-12.

containing 300 ibuprofen pills (200 mg) and determined that 99% of drug placed into the Rx Destroyer was not leachable. ECF Doc. No. 278-2 ("Wilbert Decl. Ex. 2"), Mazyck Rep. at 67 (cited in C2R's APMF ¶ 33).

Finally, Dr. Mazyck claims to have compared the ability of the carbon used in the Rx Destroyer to adsorb ibuprofen when in tap water, versus Rx Destroyer solution, and concluded that the presence of Rx Destroyer solution improved deactivation by more than 20%. Wilbert Decl. Ex. 2, Mazyck Rep. at 57 (cited in C2R's APMF ¶ 37); *see also id.* at 16 ("Indeed, there are other mechanisms in C2R's Rx Destroyer solution that deactivate drugs [aside from the activated carbon]."); *id.* at 53 (same); *id.* at 32 ("[A]ctivated carbon adsorption is not the only mechanism in the [Rx Destroyer] solution for deactivating drugs.").

### 5. DEA-certified lab test of NarcGone

The "Test Data" page of the Rx Destroyer website includes a link to a document designated "Independent DEA Certified Lab Test – Liquid Methamphetamine Concentrate." *See* ECF Doc. No. 278-40 ("Wilbert Decl. Ex. 40"). C2R's internal communications reflect that this document was prepared by C2R. *See* ECF Doc. No. 372, at 3–5 ("Second Lorentz Decl. Ex. 1"); *see also* Verde's RPMF ¶¶ 1, 24–26, and 28.

This document, dated May 1, 2017, appears to summarize the results of a test conducted on C2R's NarcGone product, by an unidentified lab described only as DEA-certified. According to this one-page summary, "[t]esting was conducted using NarcGone™ 16 fluid ounce product against verified 50% conce[n]t[r]ation of methamphetamine" and samples were analyzed using gas chromatography mass spectrometry. Wilbert Decl. Ex. 40. The following results were reported: "Based upon 5 grams methamphetamine, 65% adsorbed in 2 hours, 86% adsorbed in 24 hours, 94% adsorbed in 4 days and 100% in 7 days." *Id.* According to C2R's internal documents, C2R omitted from this lab summary additional test results that were relayed to the company: "When 12.5

grams of methamphetamine was added 70% was absorbed in 7 days." Second Lorentz Decl. Ex. 1.

This C2R-prepared document does not describe the complete testing methodology and standards used by the unidentified lab, nor does it include any of the underlying test data—and neither does the record in this case.[23] The only other support C2R offers as evidence that a DEA-certified laboratory tested its NarcGone product is vague testimony from Dallas. *See* C2R's APMF ¶ 24 (citing Wilbert Decl. Ex. 10, Dallas Dep. at 68:11–14, 120:20–121:2: "A: We did testing with Henry Nowicki, and we had a DEA certified lab confirm . . . the performance./ Q: Okay. If we look to C2R_001265, which is the very next page, this appears to be a one-page summary of – DEA certified lab summary of Narc Gone versus high concentration schedule two drug. . . . [I]s this a summary of the RTP testing of the methamphetamine that you discussed earlier?/ A: It appears to be.").

## F.   The Parties' Arguments

Although Verde calls into question many statements made in C2R's advertising—*see* Verde's SPMF ¶¶ 5–10—its motion for partial summary judgment is limited to C2R's "capacity claims." These are claims that, according to Verde, state that the Rx Destroyer products "have the capacity, through adsorption to activated carbon, to deactivate or neutralize certain volumes of medications that are placed in the products." ECF Doc. No. 353-3, at 2.

Such advertisements include those listed above in Section D, which advertise the Rx Destroyer's capabilities while simultaneously advertising the capacity of the products on a per-pill basis. *See, e.g.*, Verde's SPMF ¶¶ 11, 12, 14, and 15; First Lorentz Decl. Exs. 2, 4, 6, 9, and 10.

---

[23] According to Verde, "C2R has not produced a full test report or the underlying test results." Verde's RPMF ¶¶ 1, 24–26, and 28.

### 1. The Meaning of the Advertisements

Verde asserts that the challenged advertisements convey the message that C2R's products have the capacity to deactivate or neutralize approximate amounts of medication—ranging from 50 pills/patches to 15,000 pills/patches (and sometimes certain liquid medication volumes by the ounce)—and that this deactivation or neutralization is accomplished by adsorption to activated carbon. ECF Doc. No. 353-3, at 18; *see also* ECF Doc. No. 284, at 5 ("C2R's advertisements clearly and explicitly communicate that adsorption to activated carbon is the sole means by which the RxDestroyer products render drugs irretrievable and unavailable for abuse . . . ."). In support, Verde points to the language from the Rx Destroyer website that advertises the role activated carbon plays in the product:

- "Active medication ingredients are adsorbed or neutralized by activated charcoal." First Lorentz Decl. Ex. 4 (How to Use webpage).

- Rx Destroyer works because "as medications are dispersed the activated carbon adsorbs them rendering them useless for abuse." First Lorentz Decl. Ex. 6 (Q&A webpage).

- Rx Destroyer meets the DEA's non-retrievable standard because "[m]edications are adsorbed to carbon which are subsequently scientifically irretrievable." *Id.*

- Drugs cannot be abused after being placed in Rx Destroyer because the drugs are "chemically bound in the activated carbon's pores." *Id.*

Verde also reads these advertisements as clearly and unambiguously representing that the Rx Destroyer products can deactivate the stated number of pills through adsorption, *regardless of the medication placed inside*—in other words, regardless of whether the pills contain 5 mg of drug, or 200+ mg of drug. Verde points out that the capacity-per-pill representations previously displayed on the "Q&A" page of C2R's website indicated that capacity was based upon 200 mg Advil tablets, *see* First Lorentz Decl. Ex. 6, and also relies on the "Appendix C" previously included on the "Test Data" page of C2R's website, which identifies drugs containing more than 200 mg per pill, *see* ECF Doc. No. 262 at 71–216 ("First Lorentz Decl. Ex. 11") at C2R_000046.

C2R, on the other hand, asserts that its advertisements convey that its products hold and render approximately the stated number of pills safe for disposal using a variety of mechanisms, activated carbon adsorption being one. *See, e.g.,* ECF Doc. No. 353-5, at 11 ("the Rx Destroyer products can hold the advertised volume and . . . the advertised volume breaks down such that pills cannot be removed from the Rx Destroyer"); C2R's APMF ¶ 98 ("Verde's experts do not dispute that the Rx Destroyer products can hold [and] break[] down the stated number of pills such that pills cannot be removed from the Rx Destroyer.") (citing testimony from Verde's experts referring to the "paste" that forms when the Rx Destroyer solution is mixed with medication). In support, C2R first points to language in some of its advertisements—not all of which contain the "capacity" representations at issue in this motion—which state that the products contain, and operate using, more than just activated carbon.[24] C2R's expert, Dr. Mazyck, reads these statements as "advertising that it is the combination of ingredients in the container that work to deactivate the medication to capacity, not just the activated carbon." Wilbert Decl. Ex. 2, Mazyck Rep. at 15–16. C2R also relies on language from its advertisements stating how many pills a product may physically "hold,"[25] as well as testimony

---

[24] Advertisements at issue in this motion include ECF Doc. No. 278-42 ("Wilbert Decl. Ex. 42"). (How to use webpage) ("Each container contains a carefully formulated balance of ingredients that will destroy to medication capacity."), ECF Doc. No. 278-44 ("Wilbert Decl. Ex. 44") (Q&A webpage) ("Patent[ed] formula meets DEA regulations for destruction of controlled substances by deeming 'non-retrievable'."), ECF Doc. No. 278-46 ("Wilbert Decl. Ex. 46") ("Rx Destroyer WHAT IT DOES:/ Patented fast-acting dissolving formula/ Activated carbon- permanently adsorbs active medication ingredients"), and First Lorentz Decl. Exs. 2, 7, 8 (stating that the Rx Destroyer All-Purpose product line "*[d]issolves, adsorbs, and neutralizes non-hazardous medications (controlled & non-controlled substances).*"). Other advertisements C2R relies on for this argument include ECF Doc. No. 278-41 ("Wilbert Decl. Ex. 41") (stating that the ingredients of the Rx Destroyer formula include a "[p]atented dissolving agent [that] releases drugs active ingredients into liquid slurry" and "[a]ctivated charcoal [that] adsorbs and neutralizes the contents of the bottle") and ECF Doc. No. 278-43 ("Wilbert Decl. Ex. 43") ("Rx Destroyer is formulated to dissolve all forms of non-hazardous medications so that the active ingredients can be adsorbed and neutralized by activated charcoal.").

[25] *See* C2R's APMF ¶ 42 (citing Wilbert Decl. Ex. 44 (Q&A webpage) (stating that the various containers "can hold approximately [#] pills"); ECF Doc. No. 278-45 ("Wilbert Decl. Ex. 45") (the How to Use webpage) (stating that the various containers "hold[] approximately [#] pills/patches"); First Lorentz Decl. Ex. 2 (stating for various products that the "[b]ottle holds [#] pills"); First Lorentz Decl. Exs. 7, 8 (listing after each different sized product "([#] pills/bottle)")).

from Mr. Fowler, which C2R interprets as agreeing that advertisements using the term "holds" instead of "deactivates" are true. ECF Doc. No. 278-56 ("Wilbert Decl. Ex. 56"), Fowler Dep. at 191:14–18 (Q. All right. What about the next page? Do you see any statements that you believe are false? A. No, because it says it "holds," it doesn't say it deactivates.) (cited in C2R's APMF ¶ 43).[26]

At the very least, says C2R, this evidence establishes that its advertisements are ambiguous as to what the Rx Destroyer products must accomplish (e.g., deactivation of 100% of the stated number of pills through only adsorption by activated carbon, versus holding and rendering approximately the stated number of pills safe for disposal using a variety of mechanisms, activated carbon adsorption being one), rendering summary judgment inappropriate.

As added support for its ambiguity argument, C2R offers two definitions of the word "deactivation"—a term used by Verde in briefing, but not found in any of C2R's advertisements—along with Dr. Mazyck's opinion that "[t]hese definitions further support that deactivation is not limited to activated carbon adsorption because they contemplate other mechanisms for deactivation." Wilbert Decl. Ex. 2, Mazyck Rep. at 15–16; ECF Doc. No. 278-29 ("Wilbert Decl. Ex. 29"); ECF Doc. No. 278-30 ("Wilbert Decl. Ex. 30") (cited in C2R's APMF ¶¶ 44–46). Verde deems these alternate definitions irrelevant, because (1) C2R's advertisements do not generically advertise that they "deactivate" drugs, but instead describe adsorption as the means for neutralizing, rendering unabusable, and rendering irretrievable, and (2) even if there were other theoretical methods of "deactivation," the Rx Destroyer does not and cannot accomplish "deactivation" by any method other than adsorption because without activated carbon, all Rx Destroyer does is partially dissolve pills. *See* Verde's RPMF ¶¶ 44–46.

---

[26] Verde points out that this excerpt of Mr. Fowler's testimony refers to a page of a draft advertisement that does not describe the deactivation capabilities of the Rx Destroyer product. Verde's RPMF ¶ 43 (citing ECF Doc. No. 372, at 36–42 ("Second Lorentz Decl. Ex. 13")).

Finally, C2R asserts that its advertisements are ambiguous as to pill size, and that it is more plausible to read the capacity representations as referencing 5 mg or 30 mg tablets, rather than 200 mg tablets. Here, C2R relies on Dr. Nowicki's April 29, 2015 memoranda, in which Nowicki makes assumptions based on 5 mg and 30 mg pill sizes, and which C2R asserts was linked on its website and sent to customers with C2R's advertising. *See* C2R's APMF ¶¶ 1–2, 67–68. C2R likewise refers to testimony from its "lead sales representative" that 200 mg is "awful high" when considering controlled substances that may be placed in the Rx Destroyer (such as Lorazepam, Xanax, and hydrocortisone). ECF Doc. No. 278-31 ("Wilbert Decl. Ex. 31"), Wille Dep at 173:17–25 (cited in C2R's APMF ¶ 47).[27]

C2R also points to evidence from Verde's own experts that, according to C2R, proves there is a disputed fact about what pill size the advertisements indicate:

- Dr. Worthen testified that he does not agree that 200 mg pills is the basis for C2R's advertising. C2R's APMF ¶ 48.

- In the experiments Mr. Fowler conducted on the Rx Destroyer, he tested various sizes of pills, including 50 mg, 100 mg, 200 mg, and 220 mg sizes. C2R's APMF ¶ 49.

- Verde tested its Deterra product using pills under 100 mg, including pills less than 30 mg and even less than 5 mg. C2R's APMF ¶ 50.

Verde disputes C2R's pill-size-ambiguity argument as lacking any credible support. For example, Verde challenges the evidence that C2R offers to establish that it provided its product testing in sales communication with its potential customers. This evidence includes Dallas's declaration that: "It is my understanding that in our sales communications with potential customers C2R

---

[27] The evidence that C2R cites fails to establish that customers necessarily would read Dr. Nowicki's memoranda in conjunction with the capacity advertisements at issue, or demonstrate the typical product use, sophistication, experience, or knowledge of C2R's customer base. *See Johnson & Johnson Vision Care*, 299 F.3d at 1248 (court may not assume context); *Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009) (meaning of an advertisement should be considered in context and with reference to its intended audience).

representatives would usually include the Dr. Nowicki memos and the DEA certified lab testing performed on C2R's products." According to Verde, Dallas lacks foundation to provide information regarding particular sales communications. Verde's RPMF ¶ 2 (citing ECF Doc. No. ECF Doc. No. 372, at 7–12 ("Second Lorentz Decl. Ex. 2"), Dallas Dep. At 76:24–77:2, 78:6–11). Verde also points out that the customer emails C2R submits in support of its claim (ECF Doc. No. 353-8 ("Wilbert Decl. Ex. 8") and ECF Doc. No. 353-9 ("Wilbert Decl. Ex. 9")) include attachments that, among other things, explicitly represent that the Rx Destroyer has the ability to deactivate in excess of 90% of drugs for a number of drugs which are substantially larger than the 5 and 30 mg pills assumed by Dr. Nowicki. These attachments include the "Appendix C" discussed *supra* Section E.1 (chart identifying drugs with dosages of up to 335 mg), as well as an "Appendix D," which begins: "Dr. Henry Nowicki analyzed the results of this document on Feb. 19, 2014 and concluded that the activated carbon used in Rx Destroyer support[s] the findings of this study," followed by lists of 21 different drugs (nine of which contain more than 30 mg of active ingredient), prefaced with the statement that independent studies show at least 97% of the active ingredients in the lists are adsorbed by activated carbon. Verde's RPMF ¶ 2.

As for C2R's reliance on testimony from its lead sales representative and Verde's own experts, Verde asserts that C2R's sales representative lacks foundation to testify regarding the controlled substances likely to be disposed of in Rx Destroyer or to opine on the typical size of controlled substances, and clarifies that, according to Dr. Worthen, C2R's advertising does not always limit its capacity representations to 200 mg pills and in fact advertises and labels its products for use with medicines that "often substantially exceed 200 mg per unit dose." Verde's RPMF ¶¶ 47–48. Verde also counters that its testing of its own products is irrelevant to the falsity of C2R's capacity representations regarding C2R's product. Verde's RPMF ¶ 50.

## 2. The Falsity of the Advertisements

In addition to disagreeing about the message(s) that the advertisements at issue convey, the parties also disagree on whether those messages are false. Verde asserts that C2R's advertisements are literally false because Rx Destroyer products are incapable of deactivating the stated number of pills through adsorption by activated carbon. Verde relies on (1) Mr. Fowler's testing of the Rx Destroyer products; (2) Dr. Worthen's opinion that C2R's capacity claims are false; and (3) Dr. Mazyck's deactivation experiment test results.[28]

As to Mr. Fowler's testing, C2R responds that his testing procedure was flawed and unreliable due to numerous critical errors, resulting in incorrect and unreliable conclusions relating to the capacity of the Rx Destroyer. *See* C2R's RPMF ¶¶ 40–42; C2R's APMF ¶¶ 75–92.

C2R also disagrees with Dr. Worthen's conclusions, based on Dr. Mazyck's opinions that (1) theoretical modeling is a common and well-accepted method in the activated carbon industry; (2) Dr. Nowicki included a safety factor to account for excipients that may also be adsorbed by the activated carbon; and (3) C2R's carbon has more pore volume than Dr. Nowicki assumed. *See* C2R's RPMF ¶ 25. In support, C2R refers the Court to the pages of Dr. Mazyck's report in which he states, among other things, that his own testing of the 16 oz. Rx Destroyer revealed that the product contains 30 grams of carbon—which would mean 10.7 cc of pore space based on Dr. Nowicki's analysis—and that his own testing of the *carbon* used in the Rx Destroyer products revealed that the carbon has a cumulative pore volume of 0.4157 cc/g, which is 15% more total pore volume than identified by Dr. Nowicki in his memo, and "would suggest a different activated carbon is presently used in the Rx Destroyer product line."[29] In other words, based solely on Dr. Mazyck's

---

[28] Verde disputes Dr. Mazyck's test results as grossly overstating the percentage of deactivation due to several purported testing flaws, *see* Verde's RPMF ¶¶ 34–36, but asserts that even these inflated results prove that the Rx Destroyer does not perform as advertised.

[29] There is no evidence in the record to support this assumption, other than the differing test results reached by Dr. Mazyck and Dr. Nowicki, and C2R has not argued that it now uses a different activated carbon.

testing, the available pore space for adsorption in a 16 oz. Rx Destroyer is approximately 12.4 cc (30 grams x 0.4157 cc/g)—still much less than the 30.58 cc assumed by Dr. Nowicki in his capacity analysis.

Finally, regarding Dr. Mazyck's testing of the deactivation capacity of the Rx Destroyer containers, C2R argues that his test results actually support *its* position—as well as Dr. Mazyck's ultimate opinion—that C2R's capacity representations are as advertised. *See* C2R's APMF ¶¶ 34–36.

As affirmative evidence that its advertisements are not false, C2R relies on (1) Dr. Nowicki's analyses; (2) Dr. Mazyck's litigation testing, including his TCLP test and his test comparing the Rx Destroyer solution to water; and (3) the DEA-certified lab test of NarcGone.

Verde disputes Dr. Nowicki's analyses as a reasonable basis for C2R's capacity claims, as well as Dr. Mazyck's testing of the deactivation capacity of Rx Destroyer containers. Verde also challenges Dr. Mazyck's opinion based on his TCLP testing as conclusory and inadmissible, asserting that Dr. Mazyck failed to provide any underlying data or analysis demonstrating that he actually conducted the TCLP analysis, and what the results of that analysis were. *See* Verde's RPMF ¶ 33. Verde likewise contests Dr. Mazyck's opinion concerning the improved deactivation attributable to the Rx Destroyer solution as inadmissible because Dr. Mazyck failed to provide any information or data supporting this conclusion, and further points to Dr. Mazyck's testimony that he does not even know what is in the Rx Destroyer solution (other than it is acidic). *See* Verde's RPMF ¶ 37.

Finally, Verde disputes C2R's reliance on testing of its NarcGone product to establish the performance of the Rx Destroyer, because the C2R-generated document summarizing this testing lacks foundation, and the purported test used a liquid solution of methamphetamine (which, unlike a tablet, does not need to be dissolved nor does it contain any excipients that would interfere with adsorption). *See* Verde's RPMF ¶¶ 26–28.

Despite the length of this recitation, in general, the parties do not disagree on the material underlying facts—what testing was done, what the results were, and what testimony was given—but instead disagree on whether the other party's evidence is competent to prove its position.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings and affidavits on file show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (incorporated by Fed. R. Bankr. P. 7056). The law considers a dispute genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). As for materiality, a fact is material if it is "outcome-determinative under governing law." *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). At the summary judgment stage, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of establishing that there is no genuine issue about any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). Once the moving party puts forth evidence showing the absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to offer specific evidence showing a genuine issue for trial. *Bank of Commerce v. Hoffman*, 829 F.3d 542, 546 (7th Cir. 2016). At the summary judgment stage, the Court's role is *not* to weigh the evidence and determine the truth of the matter, but to determine whether there is something to try—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

# ANALYSIS

Section 43(a)(1)(B) of the Lanham Act forbids the use of any "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities . . . of [the seller's] or another person's goods." 15 U.S.C. § 1125(a)(1)(B).

To prevail on a false-advertising claim under this statute, a plaintiff must establish that (1) the defendant made a material false statement of fact in a commercial advertisement; (2) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; and (3) the plaintiff has been or is likely to be injured as a result of the false statement. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381–82 (7th Cir. 2018). False statements under the Lanham Act fall into one of two categories: (1) "those that are literally false" and (2) "those that are literally true but misleading." *Id.* at 382 (citing *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999)); *see also LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 948 (N.D. Ill. 2009) ("Federal false advertising claims generally fall into two categories: literal falsity and implied falsity."); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir.1992) ("A statement is misleading when, although literally true, it implies something that is false."). The proof a plaintiff must adduce to establish the first two elements of a Lanham Act claim depends on the type of statement at issue.

A literally false statement is one that necessarily will deceive consumers, so evidence of actual consumer confusion is not required. *Eli Lilly*, 893 F.3d at 382. The Seventh Circuit has described a literally false statement as being "bald-faced, egregious, undeniable, [and] over the top," *Schering-Plough*, 586 F.3d at 513, and "an explicit representation of fact that on its face conflicts with reality." *Eli Lilly*, 893 F.3d at 382; *see also Schering-Plough*, 586 F.3d at 513 ("The proper domain of 'literal falsity' as a doctrine that dispenses with proof that anyone was misled or likely to be misled is the patently false

statement that means what it says to any linguistically competent person
. . . .").

Other circuits have recognized another category of "literally false" statements—those that are false by necessary implication. Under this Lanham Act doctrine, "[i]f the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'") (quoting *Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 3 (1st Cir.2000)). The Seventh Circuit has yet to take a position on this doctrine. *Eli Lilly*, 893 F.3d at 383 n.3 (noting that at least five other circuits—the First, Second, Third, Fourth, and Ninth—have adopted this "false by necessary implication" or "misleading per se" doctrine for Lanham Act claims).

For the other category of false statements—those that are literally true but misleading—the plaintiff ordinarily must produce evidence of actual consumer confusion in order to carry its burden of establishing the second element of a Lanham Act claim (that the challenged statement "actually deceived or had the tendency to deceive a substantial segment of its audience"). *Id.* at 382.

Verde is seeking summary judgment on its theory that C2R's capacity advertisements are literally false—either explicitly false or, at the very least, false by necessary implication—and therefore that it has proven the first two elements of its Lanham Act claim as a matter of law. C2R on the other hand, asserts that the challenged statements are literally true or, at worst, ambiguous, and so they cannot be deemed literally false, meaning that Verde

must show evidence of actual consumer confusion at trial to prevail on its claims.

Whether an advertisement is literally false is a question of fact. *LG Elecs.*, 661 F. Supp. 2d at 948. In deciding whether the challenged statements are literally false, the Court must consider each statement "in context and with reference to the audience to which the statement is addressed." *Schering-Plough*, 586 F.3d at 513. Only if "the evidence is so one-sided that there can be no doubt about how the question should be answered" may the issue of literal falsity be decided on summary judgment. *LG Elecs.*, 661 F. Supp. 2d at 948 (internal quotation marks omitted). In ruling on a motion for summary judgment, the Court considers only admissible evidence, just as it would at trial. *Id.* at 948–49 (declining to consider "evidence from *Consumer Reports* articles and the like," which "is inadmissible on summary judgment to prove the truth of the matters asserted therein") (citing, *inter alia*, *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) (affirming exclusion on summary judgment of newspaper and magazine articles because "[t]hese articles constitute hearsay . . . [a]nd hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial")).

To evaluate the parties' arguments, the Court must answer two questions of fact: First, what is the obvious and unambiguous claim conveyed by each advertisement? Second, is that claim false? *See, e.g., Novartis*, 290 F.3d at 586 (citing *Clorox Co. Puerto Rico*, 228 F.3d at 34).

## A.    What obvious message(s) do the advertisements convey?

Verde asserts that the advertisements at issue unmistakably represent that the Rx Destroyer can deactivate or neutralize the identified number of pills, regardless of the medication placed inside, and that this deactivation or neutralization is accomplished by adsorption to activated carbon. C2R disagrees and asserts that, at worst, the advertisements are ambiguous—and therefore summary judgment is inappropriate—because a reasonable fact-finder could read the advertisements as conveying the messages that (1) the

method by which the deactivation/destruction/neutralization of medication is accomplished is not limited to adsorption by activated carbon; (2) the pill sizes referenced in the advertisements are (limited to) 5 mg or 30 mg tablets; and (3) the words "capacity" and "holds" refer to the product's physical storage capabilities.

To determine the messages conveyed by the advertisements at issue, the Court must look to the language used in each, in the context of each advertisement as a whole. At oral argument, counsel for Verde identified three specific advertisements as exemplars of those at issue in this motion: (1) a one-page Rx Destroyer product flyer (which contains language substantially similar to two other advertisements of record, and which the Court therefore will examine as well); (2) the former "How to Use" page of the Rx Destroyer website; and (3) the former "Q&A" page of the Rx Destroyer website.

***The one-page flyers***. Three of the challenged advertisements Verde has identified are substantially similar:

- *The Rx Destroyer product flyer* (First Lorentz Decl. Ex. 2): This advertisement states that the Rx Destroyer Drug Disposal System "[d]issolves adsorbs and neutralizes non-hazardous medications (controlled & non-controlled substances)"), and then lists four sizes of containers, each followed by a parenthetical stating the number of pills the bottle "holds." This particular advertisement does not include the word "capacity," nor does it refer to how the Rx Destroyer products dissolve, adsorb, or neutralize medications—via activated carbon or otherwise.

- *The 2017 commercial price list* (First Lorentz Decl. Ex. 7): This advertisement states that the Rx Destroyer All-Purpose Formula line of products "[d]issolves, adsorbs, and neutralizes non-hazardous medications (controlled & non-controlled substances)" and then lists six sizes of containers, each followed by a parenthetical identifying a number of pills/bottle. The top of the advertisement also includes the statement "[m]edication disposal capacity is approximate." This particular advertisement does not refer to how the Rx Destroyer products dissolve, adsorb, or neutralize medications.

- *The Rx Destroyer product list* (First Lorentz Decl. Ex. 8): This advertisement states that the Rx Destroyer All-Purpose Formula line

of products "[d]issolves, adsorbs, and neutralizes non-hazardous medications (controlled & non-controlled substances)" and then lists six sizes of containers, each followed by a parenthetical identifying a number of pills/bottle. The top of the advertisement also includes the note: "Drug volumes are approximate. Dosage forms will vary and affect volumes." This particular advertisement does not refer to how the Rx Destroyer products dissolve, adsorb, or neutralize medications.

**The former "How to Use" page of the Rx Destroyer website** (*e.g.*, First Lorentz Decl. Ex.4). This advertisement consists of several separately-titled sections, including one that provides product directions, and others labeled with the headings "Capacity by Product," "Uses," and "Quick Facts."

The "Capacity by Product" section of the advertisement contains a list of six sizes of Rx Destroyer containers, each followed by a statement that the container "holds approximately" a certain number of pills or patches.

The "Quick Facts" portion of the advertisement includes the statement that "[e]ach container contains a carefully formulated balance of ingredients that will destroy to medication capacity." As to how this "destruction" occurs, the advertisement describes the product ingredients as including (1) a "patented solution that begins dissolving medications on contact" and (2) activated charcoal that "adsorbs" or "neutralizes" active medication ingredients ("System contains patented solution that begins dissolving medications on contact. Active medication ingredients are adsorbed or neutralized by activated charcoal."). The advertisement again characterizes the "Rx Destroyer™ patented formula" with the following statements: "Fast dissolving formulation breaks medications down quickly," and "Specialty formulated activated carbon process allow[s] for increased capacity."

Finally, the "Uses" section of the advertisement states: "Combinations of medications added to the Rx Destroyer are limitless."

**The former "Q&A" page of the Rx Destroyer website** (*e.g.*, First Lorentz Decl. Ex. 6). This advertisement consists of a number of questions and answers, several of which concern the capacity and mode of action of the Rx Destroyer products.

One question asks: "What is the capacity of the Rx Destroyer All-Purpose?" The answer provides a list of seven sizes of Rx Destroyer containers, each followed by a statement that the container "can hold approximately" a certain number of pills. After this list is a set of "notes," two of which indicate that "[c]apacity [is] based upon 200mg Advil™ tablet[s]," and that "[c]alculations [are] based upon filling container to within 2" of opening." Another Q&A represents that the Rx Destroyer Liquids bottle "is at maximum capacity" when the "container contents reach within 2" of bottle opening."

As for the components of the product and their function, the advertisement discloses two main ingredients—a liquid solution and activated carbon—and describes their roles within the product as follows:

- "Rx Destroyer™ patented ready-to-use formula contains 2 major components; chemically engineered fast dissolving liquid and specially tuned activated carbon. Products containing 'dry' activated formula are opportunity for diversion and abuse because the adsorption (transfer) process cannot occur until pills are dissolved."

- "Rx Destroyer™ formulated products ensure[] neutralization of medications begins on contact. As medications are dispersed the activated carbon adsorbs them rendering them chemically useless for abuse. Follow link for test reports."

- "Rx Destroyer™ patented formula begin[s] dissolving medications on contact. As medications are dispersed the activated carbon adsorbs them rendering them useless for abuse. . . . Follow link for additional information and test reports."

The latter two statements above include hyperlinks to the "Test Data" page of the Rx Destroyer website.

The advertisement further touts the role of activated carbon in allowing the product the meet the DEA's non-retrievable standard:

- "Rx Destroyer™ pharmaceutical meet[s] DEA disposal standards" because "[m]edications are adsorbed to carbon which are subsequently scientifically irretrievable. Patent[ed] formula meets DEA regulations for destruction of controlled substances by deeming 'non-retrievable'."

- A drug placed in an Rx Destroyer is "NOT retrievable, because it is chemically bound in the activated carbon's pores. It takes commercial reactivation, furnace at 1700° to restore carbon. Their boiling points are too high for desorption without breaking bonds, so the drugs will never leave the pores as the whole and thus once adsorbed and the carbon bed is drained, there is no mechanism for the drugs to leave the pores as the original molecule." As a result, drugs cannot "be abused after placing in Rx Destroyer™."

Finally, in one Q&A, the advertisement uses interchangeably the verbs adsorb, destroy, and neutralize:

Q: I see capsules floating in Rx Destroyer™. Have these medications been neutralized?

A1: Capsule and contents may be lighter than water which is why you may see some floating. Capsule shells come in hard or soft shells manufactured in variety of materials such as protein based gelatin and other bio-safe polymers. During the adsorption/destruction/neutralization process some may appear in the original form or varying levels of collapse. These shell conditions are considered normal and expected.

Verde first asserts that the above advertisements (and those that use similar language) *explicitly* represent that the Rx Destroyer can deactivate or neutralize the identified number of pills through adsorption to activated carbon. In the alternative, says Verde, the advertisements at least convey the same message through necessary implication. The Court will address each argument.

### 1.    What messages do the advertisements *explicitly* convey?

According to Verde, C2R's capacity representations explicitly convey the following messages:

1. Adsorption to activated carbon is the sole means by which the Rx Destroyer products render drugs irretrievable and unavailable for abuse;

2. The products work to deactivate/neutralize/adsorb the stated number of pills, regardless of the medication placed inside; and

3. The words "hold" and "capacity" refer to the product's ability to deactivate drugs through adsorption to activated carbon.

At least as to some of these arguments, Verde is correct.

### a.   How the Rx Destroyer products work

Regarding the mechanism of action at work in the Rx Destroyer products, both the former "How to Use" website page and the former "Q&A" website page expressly state that the purpose of the liquid solution in the Rx Destroyer is to *dissolve* medications (and, in one instance "break[] medications down"), so that they can be adsorbed by activated carbon. The advertisements do not describe the liquid solution as having any other role in the neutralization, adsorption, or destruction of drugs.[30] Instead, it is the activated carbon that "adsorbs and neutralizes" the active medication ingredients, rendering them "useless for abuse" and "irretrievable" within the meaning of the DEA's standards, because the drugs are "chemically bound in the activated carbon's pores."[31]

These two advertisements explicitly convey that adsorption to activated carbon is the sole means by which the Rx Destroyer products "neutralize" drugs, or render drugs irretrievable and unavailable for abuse. No reasonable fact-finder could find otherwise.

The same is not true for the one-page flyers, however. While these advertisements state that the Rx Destroyer dissolves, adsorbs, and neutralizes

---

[30] In support of their respective arguments, Verde and C2R both point to language in other C2R advertisements—not directly at issue in this motion because they do not contain numerical capacity claims—that likewise describes the role of the liquid solution as dissolving medication. *See* ECF Doc. No. 262 at 8–9 ("First Lorentz Decl. Ex. 3") (stating that the ingredients of the Rx Destroyer formula include a "[p]atented dissolving agent [that] releases drugs active ingredients into liquid slurry" and "[a]ctivated charcoal [that] adsorbs and neutralizes the contents of the bottle"); ECF Doc. No. 262 at 16 ("First Lorentz Decl. Ex. 5") ("Rx Destroyer is formulated to dissolve all forms of non-hazardous medications so that the active ingredients can be adsorbed and neutralized by activated charcoal.").

[31] In support of other of its arguments, C2R urges that its capacity representations cannot be false because it disclosed the basis for its claims—including Dr. Nowicki's memos—on its website. Notably, Dr. Nowicki's analyses involved no study or testing of the solution contained in the Rx Destroyer; indeed, Dr. Nowicki did not even "test" any of the Rx Destroyer products, but instead engaged in theoretical analyses concerning only the *carbon* purportedly contained in the Rx Destroyer products. To the extent C2R attempts to qualify its claims by incorporating Dr. Nowicki's analyses, his memoranda—and their focus on carbon alone—undercut C2R's theory that the advertisements at issue convey the message that the liquid solution does anything other than dissolve the pills to allow medication to be adsorbed by the activated carbon.

medications, they provide no further information about how those results are achieved. The advertisements refer to neither activated carbon nor the Rx Destroyer solution. It cannot be said that these advertisements make any express claims about the role of activated carbon in the product—let alone that they *explicitly* state that adsorption to activated carbon is the sole means by which the Rx Destroyer products "deactivate" drugs.

### b.    Pill size

Turning to the dispute about pill size, Verde asserts that the advertisements convey the message that the products work to capacity, regardless of the medication placed inside—in other words, regardless of whether all the pills placed inside are 5 mg or 200 mg. C2R, on the other hand, asserts that the advertisements are ambiguous as to what pill size they refer: "Although not definitively stating what pill size the advertisements convey, Verde bases some of its arguments on a 200 mg pill size. . . . The more plausible reading of C2R's advertisements is that pill sizes reference 5 mg or 30 mg tablets." ECF Doc. No. 353-5, at 19.

In support of its contention, C2R relies, in part, on Dr. Nowicki's April 29, 2015 memorandum, which makes certain calculations based on assumptions of 5 mg and 30 mg pill sizes, and which C2R asserts was linked on C2R's website and sent to customers with C2R's advertising.[32] This argument is problematic for a number of reasons. First, there is no evidence in the record to establish that C2R qualified its pill capacity numbers via direct link to Dr. Nowicki's memorandum. Although certain answers in the Q&A portion of the Rx Destroyer website referred readers to information on the website's "Test Data" page, this link was not provided specifically in relation to the capacity representations, on either the former Q&A webpage, or the former "How to Use" webpage. Second, and more importantly, even if the link were

---

[32] C2R also cites testimony from its former sales representative that 200 mg is "awful high" when considering the controlled substances likely to be disposed in Rx Destroyer, but this testimony lacks foundation and is insufficient to establish that customers likely assumed pill sizes smaller than 200 mg.

provided, it would be insufficient to change the plain language of the advertisements at issue—particularly the former "Q&A" webpage, which expressly states that "[c]apacity [is] based upon 200mg Advil™ tablet[s]." *See, e.g.*, *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 906 F. Supp. 178, 182 (S.D.N.Y. 1995), *aff'd*, 100 F.3d 943 (2d Cir. 1996) ("[A] footnote or disclaimer that purports to change the apparent meaning of the claims and render them literally truthful, but which is so inconspicuously located or in such fine print that readers tend to overlook it, will not remedy the misleading nature of the claims.") (internal quotation marks omitted); *Eli Lilly*, 893 F.3d at 383 (a disclaimer that appeared in tiny print in a television commercial and an obscure location on a webpage were insufficient to dispel the central message of the advertisements at issue).

In the former "How to Use" webpage, C2R represents that "[c]ombinations of medications added to the Rx Destroyer are limitless." C2R now wants to walk back the unqualified language of its advertisements, urging the Court to find its message equivocal. Whether C2R *intended* to convey a different message, the text of its advertisements is clear—there is no explicit limitation stating that the capacity numbers identified are valid for pills of only 30 mg or less. C2R's attempt to create ambiguity through extrinsic evidence must fail: "In evaluating whether an advertisement is literally false, the court looks to the actual words in the advertisement." *Dyson, Inc. v. Sharkninja Operating LLC*, 259 F. Supp. 3d 816, 831 (N.D. Ill. 2017); *see also Johnson & Johnson-Merck Consumer Pharm. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 393 (S.D.N.Y.), *aff'd,* 90 F. App'x 8 (2d Cir. 2003) ("Had the advertisements been differently worded, . . . this case would be very different. [The defendant] chose its language and now must live with the consequences."); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 202 (3d Cir. 2014) ("[The defendant] chose a definition for steam power and now must live with it. It cannot use a consumer survey to create an ambiguity out of whole cloth."). That the

statement at issue is broad—and not limited to pill sizes of 30 mg or less, as C2R now may wish it were—does not make it ambiguous.

For these reasons, the Court concludes that no reasonable fact finder could find that the pill sizes referenced in C2R's advertising were limited to 5 mg or 30 mg tablets, as C2R urges. The express language of the statements at issue is susceptible to only one reasonable interpretation as to pill size: the capacity representations apply to pills in excess of 30 mg, including (as specifically stated in the former Q&A webpage) 200 mg.

### c. The meaning of "capacity" and "hold"

Verde's argument that the advertisements make explicit representations about the meaning of the words "capacity" and "holds" does not fare as well as the arguments discussed above . "To make something explicit is to state it clearly and precisely." *Groupe SEB*, 774 F.3d at 199. None of the advertisements at issue *explicitly* define capacity or hold to mean ability to adsorb/deactivate. *Compare id.* at 199–200 ("[W]hen [the defendant] took the affirmative step to include a reference on [its product] packaging that clearly defined the key term in its claim—that steam power is measured in grams per shot—it made an explicit claim. . . . There is only one available conclusion and only one plausible meaning—the claim means exactly what the reference on the packaging says it does.") *with Schering–Plough*, 586 F.3d at 513 ("[S]uppose the labels on the defendants' products stated: 'All polyethylene glycol 3350, by whomever made, can be sold only by prescription; there is no over-the-counter version of this drug.' That would be false and misleading per se . . . . But that is not what the labels say. . . . Obviously *this* product, the product of the named manufacturer, is prescription only, but it is not obvious, as [the plaintiff] contends, either from the labels or from the package inserts . . . that every other product containing polyethylene glycol 3350 is prescription only.").

Here, for example, the 2017 commercial price list refers to the "medication disposal capacity" of the products, while the Rx Destroyer product list states that "[d]rug volumes are approximate," and "[d]osage forms will vary

and affect volumes." And the former Q&A webpage indicates that capacity "[c]alculations [are] based upon filling container to within 2" of opening," and that that the Rx Destroyer Liquids bottle "is at maximum capacity" when the "container contents reach within 2" of bottle opening." Nothing in the express language of the advertisements compels the conclusion that capacity has a specialized meaning here, as capacity to deactivate or adsorb via activated carbon.

In support of its "explicit falsity" argument, Verde invokes *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48 (2d Cir. 2016). *See* ECF Doc. No. 353-3, at 18 ("[T]here was explicit falsity when a home pregnancy kit advertised that it would indicate how many weeks a woman was pregnant, but it measured weeks passed since ovulation, whereas the universal standard used by doctors was number of weeks since last menstrual period.") (citing *Church*). But *Church* involved a finding of literal falsity by necessary implication—not explicit falsity. *See Church*, 843 F.3d at 65–66 ("The district court found that the [advertisements] were literally false by necessary implication . . . . [A]lthough none of these materials expressly stated that the Product estimates weeks-pregnant using a metric consistent with the metric doctors would use, these materials included statements and images, which, when considered in context, unambiguously implied that false message."). *Church* does not help Verde with its explicit falsity argument, and Verde has pointed to no other comparative authority in support of its position.

Because the advertisements at issue here do not expressly define "capacity" and ability to "hold" to mean ability to adsorb via activated carbon, Verde is not entitled to summary judgment under this "express" theory of literal falsity. As a result, the Court must consider Verde's alternate theory, that the advertisements convey the allegedly false message by necessary implication.

### 2. What messages do the advertisements convey by necessary implication?

#### a. Status of the necessary implication doctrine

As noted above, the Seventh Circuit has not adopted the doctrine of literal falsity by necessary implication, but it likewise has not repudiated it. In *Eli Lilly*, the Seventh Circuit noted that at least five other circuits—the First, Second, Third, Fourth, and Ninth—have expressly adopted the "false by necessary implication" doctrine for Lanham Act claims. 893 F.3d at 383 n.3. In addition, the Sixth, Eight and Federal Circuits, as well as the Tenth Circuit (in an unpublished, nonprecedential disposition) have either adopted, or recognized with approval, the false by necessary implication framework in evaluating literal falsity claims. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735–36 (6th Cir. 2012) ("A 'literally false ' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'") (quoting *Novartis,* 290 F.3d at 586–87); *Buetow v. A.L.S. Enterprises, Inc.*, 650 F.3d 1178, 1185–86 (8th Cir. 2011) ("Though literal falsity may be conveyed by necessary implication, 'when a Court considers whether a message is necessarily implied from the product's name and advertising, it must determine whether the false message will necessarily and unavoidably be received by the consumer.'") (quoting *Novartis,* 290 F.3d at 588); *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1367 (Fed. Cir. 2013) ("A claim may be 'literally false' for Lanham Act purposes if it is 'false by necessary implication.'") (quoting *Time Warner,* 497 F.3d at 158); *Zoller Labs., LLC v. NBTY, Inc.,* 111 Fed. App'x. 978, 982 (10th Cir. 2004) (unpublished) ("Although factfinders usually base literal falsity determinations upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by necessary implication.") (quoting *Clorox Co. Puerto Rico*, 228 F.3d at 34–35) (internal quotation marks omitted).

Within the remaining federal circuits, no Circuit Court of Appeals has rejected the doctrine, and it has been employed by lower federal courts in

analyzing Lanham Act claims. *See Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240–41 (5th Cir. 2014) (observing that the First, Second, Third, Fourth, Ninth, and Federal Circuits have adopted the "false by necessary implication" doctrine, but declining to decide whether to do the same); *Ameritox, Ltd. v. Millennium Labs., Inc.*, 889 F. Supp. 2d 1304, 1315 (M.D. Fla. 2012) ("The 'false by necessary implication' doctrine has not been expressly recognized by the Eleventh Circuit, but it has been recognized by other circuit courts, and the concept has been applied by district courts within this circuit."); *see also LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2009 WL 5579006, at *6 (N.D. Ill. Nov. 23, 2009) (declining to certify for appeal the question of whether the Seventh Circuit should recognize a claim for literal falsity by necessary implication, because the defendant "failed to present any controlling Seventh Circuit case law indicating a repudiation of the literal falsity by necessary implication doctrine . . . [or] cite to any circuits that have repudiated the doctrine," and likewise failed to establish a substantial likelihood that the district court's ruling—in which the court applied the literal-falsity-by-necessary-implication doctrine—would be reversed on appeal).

As a result, the Court will consider Verde's argument of literal falsity by necessary implication, using the rubric established by circuit courts outside the Seventh Circuit. "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Clorox Co. Puerto Rico*, 228 F.3d at 35; *see also Novartis*, 290 F.3d at 588 ("[W]hen a Court considers whether a message is necessarily implied from the product's name and advertising, it must determine whether the false message will necessarily and unavoidably be received by the consumer."); *Design Res. v. Leather Indus. of Am.*, 789 F.3d 495, 502–03 (4th Cir. 2015) (stating "the contested conclusion" must "necessarily flow[] from the ad's statements" or be "logically necessary").

###  b.    Scope of the necessary implication doctrine

Courts have been careful to emphasize the limits to this theory of liability. An advertisement can be found false by necessary implication only if it is open to no more than one plausible reading: "[I]f the language . . . is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Time Warner*, 497 F.3d at 158 (citing *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 275 (4th Cir. 2002) (a literal falsity argument fails if the statement or image "can reasonably be understood as conveying different messages"); *Clorox Co. Puerto Rico*, 228 F.3d at 35 ("[A] factfinder might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim . . . .")). Similarly,

> [t]he greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, . . . the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.

*Clorox Co. Puerto Rico*, 228 F.3d at 35 (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1181 (8th Cir. 1998)); *see also Design Res., Inc.*, 789 F.3d at 502 (the concept of literal falsity by necessary implication does not allow a court to "follow [the plaintiff's] winding inquiry far outside the face of the ad"). In other words, an advertisement is not literally false if it relies on consumers to make assumptions or draw inferences that an advertisement merely *suggests* to reach the false conclusion.

In *Novartis*, for example, the Third Circuit held that the district court clearly erred in finding that the name "Mylanta 'Night Time Strength'" necessarily implied a message of superior efficacy, because "consumers will only receive a message of superior relief from the MNTS name and advertising if they assume that a product that provides 'Night Time' relief is more effective than a product that provides 'Extra Strength' or 'Maximum' relief. The MNTS name and advertising alone do not require that this inference will be made."

290 F.3d at 588. On the other hand, the district court *did not* clearly err in finding that the name "Mylanta 'Night Time Strength'" conveyed by necessary implication the message that the product was specially formulated to relieve nighttime heartburn: "[T]he term 'nighttime' conveys a different meaning than the terms 'regular,' 'extra,' and 'maximum.' The latter terms describe different degrees of strength . . . . By contrast, the 'nighttime' designation describes not a degree of strength, but rather a time when the product will be effective. The phrase 'nighttime strength' therefore necessarily conveys a message that the MNTS product is specially made to work at night." *Id.* at 589.

In determining whether an advertisement necessarily implies a false message in context, the text of the advertisement surrounding the disputed claim is a relevant consideration. For example, in *Groupe SEB*, the defendant made two advertising claims on the front of the packaging for its steam irons: the top right of the box stated that the product delivers "# 1 MOST POWERFUL STEAM*," while the bottom right of the box displayed the statement "MORE POWERFUL STEAM vs. Rowenta®[] at half the price." 774 F.3d at 195. The first statement was qualified with a fine-print reference on the bottom of the packaging, indicating that the product "*[o]ffers more grams per minute (maximum steam setting while bursting before water spots appear) when compared to leading competition in the same price range, at time of printing." *Id.* The district court recognized that this fine-print reference expressly restricted the claim to comparisons with steam irons in the *same* price range, and that Rowenta steam irons were in a *higher* price range, meaning that the first advertising claim did not explicitly compare the defendant's products to the Rowenta steam irons. *Id.* at 199. Nevertheless, the court concluded that this comparison was necessarily implied, because, when viewed in context, the claim—which was located in close proximity to the "MORE POWERFUL STEAM vs. Rowenta" claim—conveyed an unambiguous message of superiority over Rowenta steam irons. *Id.* The Third Circuit agreed that a consumer would unavoidably receive a false message from the advertising at issue: "The '# 1

MOST POWERFUL STEAM' claim appears directly above the 'MORE POWERFUL STEAM vs. Rowenta' claim, and the proximity of the two claims necessarily and unavoidably conveys a message that [the defendant's] steam irons offer the most powerful steam, even when compared to Rowenta steam irons." *Id.* at 202.

Other relevant considerations in a "false by necessary implication" analysis include the nature of the business at issue and the product being sold. *See Avis Rent A Car System, Inc. v. Hertz Corp.,* 782 F.2d 381 (2d Cir. 1986). In *Avis Rent A Car*, car-rental company Avis sued competitor Hertz over an advertisement that proclaimed in large bold print: "Hertz has more new cars than Avis has cars." *Id.* at 382. Below that statement was a photograph of mechanics unloading a truckload of apparently new cars into an airport parking lot, followed by the text: "If you'd like to drive some of the newest cars on the road, rent from Hertz. Because we have more new 1984 cars than Avis or anyone else has cars—new or old. . . . Whether you're renting for business or pleasure, chances are you'll find a domestic or imported car you'll want to drive." *Id.* At the bottom of the advertisement, also in large, bold type, was Hertz's slogan, "The # 1 way to rent a car." *Id.*

The literal truth or falsity of the statement at issue—"Hertz has more new cars than Avis has cars"—turned on whether it referred to the *rental* fleets or the *total* fleets of the two companies. *Id.* at 383. If the statement was read to mean total fleets (which included cars in in the process of being sold that were no longer available for rental), then the advertisement was literally false; if, on the other hand, the statement was read as being limited to rental fleets, then the statement was literally true. *Id.* The district court concluded that because the advertisement said "cars," and not "cars for rent," it had to be read as referring to the companies' total fleets, so was literally false. *See id.* at 384. The Second Circuit reversed, holding that the district court's finding was clearly erroneous. *Id.*

In doing so, the Second Circuit examined the advertisement in its entirety (noting that it featured a large picture of an airport rental lot and made three specific references to rentals), as well as the nature of the parties' business and the intended audience of the advertisement: "Hertz and Avis have made their reputations as companies that *rent* cars, not companies that sell or merely own cars. *Id.* The advertisement was placed in publications that would come to the attention of prospective renters, not car buyers or financial analysts." *Id.* at 385. Taking this context into consideration, the court concluded that the statement "Hertz has more new cars than Avis has new cars" could only be understood as referring to the companies' rental fleets. *Id.* The court elaborated:

> Fundamental to any task of interpretation is the principle that text must yield to context. Recognizing this, the Supreme Court long ago inveighed against "the tyranny of literalness." In his determination to "go by the written word" and to ignore the context in which the words were used, the district judge in the present case failed to heed the familiar warning of Judge Learned Hand that "[t]here is no surer way to misread any document than to read it literally," as well as his oft-cited admonition that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary[.]"

> These and similar invocations against literalness, though delivered most often in connection with statutory and contract interpretation, are relevant to the interpretation of any writing, including advertisements.

*Id.* (internal citations omitted).

### c.    Application of the necessary implication doctrine

Here, the text of the advertisements that surrounds the "capacity claims," as well as the nature and purpose of the Rx Destroyer products, provide relevant context for the Court's analysis.

Turning first to the former Q&A page of the Rx Destroyer website, these three questions are asked and answered: "How does Rx Destroyer pharmaceutical disposal system work?"; "Does Rx Destroyer pharmaceutical meet DEA disposal standards?"; and "Can drugs be abused after placing in Rx Destroyer?" Verde contends that these questions and their corresponding answers convey the inescapable message that medications placed in the

product will be deactivated or neutralized by activated carbon adsorption, to the capacity/volume stated.

C2R makes a context argument in response. C2R points to the terms "patented formula" in the first question above ("Q: How does Rx Destroyer™ pharmaceutical disposal system work? A: Rx Destroyer™ patented formula begin[s] dissolving medications on contact. . . ."), to argue that neutralization takes place not only by carbon absorption but also by the action of the solution within its product. This additional action at least means, according to C2R, that the consumer receives more than one message about how the product works. C2R also points to the directive in the second and third Q&A to "follow [the] link" for additional information and test reports to argue that the consumer is asked to consider many components of the Rx Destroyer's advertising, thus making any single implication too attenuated.

But the additional text to which C2R points does not make the message received by the customer ambiguous. These statements on the Q&A portion of the Rx Destroyer website expressly state what the product accomplishes—deactivation/neutralization through adsorption to activated carbon, so that medications are rendered irretrievable, and so they cannot be abused once they are placed in the container. The clarity of the statement of purpose, combined with the statement of capacity (using the word "hold"), conveys the single message that the product will perform its advertised function—neutralization and adsorption of active medication ingredients by activated carbon—up to the stated capacity. There is nothing in this advertisement that suggests to the consumer the word "hold" has another purpose—storage, for instance. After reading the Q&A advertisement as a whole, the only plausible message that a consumer will take away from the capacity statements is that the number of pills the product can "hold" is the same number of pills (approximately) that the product will neutralize via activated carbon adsorption.

As for the former "How to Use" page of the Rx Destroyer website, the advertisement makes similar statements, but the implications about capacity are not as strong. The "Quick Facts" section of that advertisement describes:

- "System contains patented solution that begins dissolving medications on contact. Active medication ingredients are adsorbed or neutralized by activated charcoal. . . ."

- "Each container contains a carefully formulated balance of ingredients that will destroy to medication capacity."

- "Specialty formulated activated carbon process allow[s] for increased capacity."

Verde contends that the resulting message, by necessary implication, is that activated carbon neutralizes or deactivates the (stated) capacity of pharmaceuticals. C2R disputes that there can be only one message perceived by consumers. Pointing to the use of the words "solution" and "carefully formulated balance of ingredients," C2R refutes that the important functions of the product are carried out by only activated carbon. C2R argues that to "destroy" medication can mean to dissolve in a slush that becomes safe for disposal, a different result than 100% deactivation of the medication via adsorption to activated charcoal. The text of the advertisement indicates that both adsorption and destruction will occur. Consequently, it would not be implausible for a consumer to receive those statements as two different messages about product function, messages that are not inconsistent with the nature of the product.

More importantly—and unlike the Q&A website page—this particular advertisement does not contain language equating the end result of the product (here, destruction) to being irretrievable or chemically useless for abuse due to carbon adsorption. It would be improper for the Court to presume, without any supporting evidence, that consumers would read the How to Use webpage in conjunction with the Q&A webpage: "[w]hile the court should consider context, it may not *assume* context." *Johnson & Johnson Vision Care*, 299 F.3d at 1248 (district court erred in evaluating three advertisements in concert based on its

erroneous assumption that consumers would be exposed to every advertisement in a campaign). Drawing all reasonable inferences in favor of C2R as the non-movant, the Court cannot conclude that the former How to Use webpage necessarily implies that the advertised "capacity" of the Rx Destroyer is the capacity to neutralize or adsorb via activated carbon.

The same result follows for the one-page flyers. After reading the language in each flyer standing alone, there is no single message customers could "unavoidably receive" about how the Rx Destroyer product works or its intended end result. Granted, the nature of the Rx Destroyer business and product line is disposal of pharmaceuticals and medications. But while all of these flyers state that the product "dissolves, adsorbs and neutralizes" medication, none provide any information as to the activating ingredient or mechanism by which the pharmaceuticals are "adsorbed and neutralized" in a particular capacity.

Verde seems to suggest that the Court should view these flyers as one component of an overall advertising campaign that includes the other capacity advertisements discussed above, but Verde has neither alleged, nor provided any admissible evidence, that consumers would see these flyers together with any other of C2R's advertisements. *Cf. Johnson & Johnson Vision Care*, 299 F.3d at 1248 (analyzing the statements made in a pamphlet within the context of a letter that accompanied it).[33] Nor has Verde offered any evidence of the nature and sophistication (or lack thereof) of the "audience to which the statement[s] [are] addressed," *Schering-Plough*, 586 F.3d at 513, which could

---

[33] As one of its proposed material facts, C2R asserts that it "provided its product testing in sales communication with its potential customers," and in support, relies on (1) a declaration from Dallas ("It is my understanding that in our sales communications with potential customers C2R representatives would usually include the Nowicki memos and the DEA certified lab testing performed on C2R's products.") and (2) copies of two email chains with customers or prospective customers, Wilbert Decl. Ex. 8 and Wilbert Decl. Ex. 9, which include some of the one-page flyers at issue, as well as additional information that explains the mechanism of action at work in the Rx Destroyer. Verde disputes C2R's proposed fact, in part because "Mr. Dallas lacks foundation to provide information regarding particular sales communications." But even if Verde had not disagreed with C2R's assertion, the existence of these two emails does not satisfy Verde's burden on summary judgment to present admissible evidence establishing any larger context in which consumers would read C2R's flyers.

enable the Court potentially to attribute specialized knowledge or experience to the target consuming population. The Court likewise cannot assume or infer that consumers reading the advertisements will go to the Rx Destroyer website to obtain more information about the product and thereby learn about the particular activating ingredient. Such extra work is more than the necessary-implication test can bear, even if there were evidence on this summary judgment record about the website usage and habits of Rx Destroyer's customers.

In sum, the Court concludes that only the former Q&A webpage of the Rx Destroyer website conveys, by necessary implication, the full message advanced by Verde—that the Rx Destroyer products are capable of deactivating the stated capacities of medication (approximate numbers of pills) via activated carbon adsorption—as a matter of law. The question for the Court now becomes whether that message is false.

**B.** **Are the messages conveyed by the advertisements false?**

In determining whether the numerical capacity claims in the former Q&A webpage are false, the Court must ask whether, in light of the undisputed material facts, no reasonable fact-finder could conclude that the Rx Destroyer products are capable of deactivating the stated capacities of medication (which expressly includes 200 mg Advil pills).

Verde asserts that the claims are false because the undisputed evidence—Dr. Mazyck's own "deactivation" testing of the Rx Destroyer products—shows that the Rx Destroyer products do not have sufficient carbon to deactivate or neutralize the volume of medication that C2R claims they can.

C2R makes several arguments in response. As its primary point, C2R contends that summary judgment is not warranted because the experts disagree on what testing must be performed to determine capacity ("At its core, this dispute is about what testing must be performed to determine capacity, an issue subject to significant disagreement among . . . the experts," ECF Doc. No. 353-5, at 23), which creates a material dispute of fact regarding the

performance of C2R's products. In doing so, C2R makes two broad assertions: (1) "In a false advertising case related to product testing, the defendant need only establish that it has valid independent tests that support its claims," *id.* (citing *Dyson, Inc.*, 259 F. Supp. 3d at 835; *RyMed Techs., Inc. v. ICU Med., Inc.*, No. 3:10-01067, 2012 WL 4505896, at *12 (M.D. Tenn. Sept. 28, 2012); *Riddell, Inc. v. Schutt Sports, Inc.*, 724 F. Supp. 2d 963, 979 (W.D. Wis. 2010)); and (2) Verde cannot prevail at summary judgment because "C2R fully disclosed its bases for its capacity statements," ECF Doc. No. 353-5, at 28–29 (citing *Extreme Sports Divas, LLC v. Polartec, LLC*, No. 17-CV-213-JDP, 2018 WL 1953911, at *3 (W.D. Wis. Apr. 25, 2018) (because the defendant provided a technical information sheet that identified its testing procedures, the plaintiff did not prove that defendant's advertisements were false in the context of the testing procedures identified)).

But the cases on which C2R relies concern "establishment" claims—advertisements "in the form 'tests show x,'"—which may be proven false only by evidence that the cited tests "do not prove the proposition," *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1090–91 (7th Cir. 1994), or, at the very least, are unreliable, *Riddell*, 724 F. Supp. 2d at 971 ("Some circuits have added that an establishment claim can be literally false even if the cited test or study *does* prove the proposition, if the test was 'not sufficiently reliable to permit one to conclude with reasonable certainty that [the test] established the proposition for which' it was cited.") (quoting *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62–63 (2d Cir.1992)).

Neither Verde nor C2R has argued—nor has this Court concluded—that the claims at issue in this motion are "establishment" claims.[34] The standards for proving the truth or falsity of establishment claims are therefore

---

[34] Even if C2R were to urge the Court to read its claims in such a manner, C2R's repeated reliance on the fact that the webpages at issue contain links to some of Dr. Nowicki's theoretical modeling reports is unavailing. Indeed, the former Q&A webpage spanned 31 questions, and no more than three of them—none of which concerned the numerical capacity of the Rx Destroyer products—appear to provide links to the Nowicki work. *See Eli Lilly*, 893 F.3d at 383 (placing information "in an obscure location on [a] webpage" cannot dispel the "central message" of an advertisement).

inapplicable to the dispute currently before the Court. For this reason, it is not dispositive whether, as C2R asserts, "a reasonable jury could find that Dr. Nowicki's analysis and the Narc Gone testing are valid independent tests," or "Dr. Nowicki's GAED testing provides a reasonable basis for C2R's capacity representations," or the DEA-certified lab test of NarcGone provided a reasonable basis for C2R to conclude that "Rx Destroyer could deactivate . . . 750 tablets [of methamphetamine hydrochloride], or well over the 300 pill capacity identified in C2R's capacity representations." *See* ECF Doc. No. 353-5, at 24–5.

Instead, the preliminary question for the Court is whether the "test" or analysis at issue is capable of proving the truth or falsity of the advertising claims. Here, those claims are framed in the following manner: The Rx Destroyer All-Purpose 16 oz. product can neutralize or deactivate, through activated carbon adsorption, approximately 300 pills (of 200 mg Advil tablets). Although Dr. Nowicki's GAED analysis and theoretical modeling may be valid and accepted in the activated carbon community (a fact that Verde disputes), they cannot prove or disprove the falsity of C2R's capacity claims; they merely predict, rather than measure, the actual performance of the Rx Destroyer products.[35] So even assuming a reasonable fact-finder could find that Dr. Nowicki's analyses and the NarcGone testing were valid tests generally, and afforded C2R some predictive abilities, it does not follow that a reasonable fact-finder likewise could find that C2R's products do, in fact, meet the represented capacities.

In sum, the best-test debate among the experts is not material at this stage, and the Court will not resolve it here. For present purposes, the focus comes down to whether there is a genuine issue of material fact as to the accuracy or inaccuracy of Dr. Mazyck's (actual product) testing. If there is no

---

[35] The situation would be different if C2R's advertisements had instead included an express disclaimer within the body of the advertisement, *e.g.*, "product capacity numbers are based on theoretical modeling performed by Dr. Henry Nowicki, in which he predicts adsorptive capacity of the Rx Destroyer carbon based on pills of up to 30 mg."

dispute, then the Court can reach a conclusion as to the literal falsity of the claims on the former Q&A webpage. If there remains a genuine dispute of material fact, then the Court cannot make a determination on this summary judgment record, and the issue will await trial.

C2R retained Dr. Mayzck midway through the Verde litigation (Dr. Nowicki, who had performed the initial theoretical modeling in 2015, passed away not long after this litigation began). Dr. Mazyck is the Director of Electronic Delivery of Gator Engineering at the University of Florida, and has a Ph.D. and master's degree in environmental engineering. He designed some simple tests placing a number of pills of a single type of medication (ibuprofen, Advil, aspirin, Claritin, and Sudafed) in a bottle with Rx Destroyer contents, and then measured the amount of active medication remaining, after different intervals. He also performed certain tests on the Rx Destroyer solution, as well as the purported environmental impact of used Rx Destroyer containers.

One opinion that can be dealt with easily is Dr. Mayzck's opinion that the liquid solution inside the Rx Destroyer containers contributes to the deactivation process, and that it deactivates at a greater rate than mere water would. His opinion is in contrast to other testimony from another C2R witness, Dallas, who stated that the liquid is an aqueous solution which does not deactivate or destroy medications, but is involved only in transferring them to the activated carbon. The Court finds that this testimonial difference does not present a genuine dispute of material fact, because the material facts concern deactivation/neutralization adequacy of activated carbon, and not whether the liquid which dissolves the medications placed into the product also may assist incrementally with deactivation/neutralization.[36] Similarly, Dr. Mazyck's TCLP test, which yielded a conclusion that 99% of drug placed into Rx Destroyer was not leachable, is not relevant to determining whether the capacity claims on

---

[36] To the effect that C2R relies on more than Dr. Mazyck's scientific opinion about product content and function, but also his testimony about "advertising the combination of the ingredients" that are at work, the Court will not consider the latter because Dr. Mazyck is not offered nor qualified as an advertising expert.

the Q&A webpage are accurate, and so will not be considered further on this motion.

Turning to Dr. Mazyck's deactivating testing, Verde appears to hang its argument of literal falsity on the results of Dr. Mazyck's Sudafed and Claritin tests, which showed deactivation levels of only 59% and 68%, respectively. These two tests standing alone, however, are not sufficient for the Court to conclude that C2R's advertisements are false as a matter of law, when viewing the record as a whole and drawing all inferences in C2R's favor. For example, Dr. Mazyck's reported deactivation test results of ibuprofen, Advil, and aspirin indicate that the Rx Destroyer deactivated at least 90% of the pills placed in his testing bottles. To be clear, Verde disputes the accuracy of these test results, for several reasons. First, Verde says that Dr. Mazyck physically removed active ibuprofen from his purportedly deactivated samples by filtering them before actually testing them for active medication content. Verde contends, based on testing that Mr. Fowler did, that this early filtering reduced the level of active medication in the test bottles, resulting in artificially high percentages of "deactivation/neutralization" reported. C2R disagrees.

Second, Verde faults Dr. Mazyck for "ignoring" the particulate (or "paste") collected at the bottom of his testing containers below the liquid layer (supernatant) resting on top, by drawing his samples from the supernatant without stirring the contents of the container to bring any of the particles up into his samples. There is no dispute that Dr. Mazyck did not stir the contents of his test bottles when he made his interval measurements. Verde argues that the solids below the supernatant consisted of massive amounts of undissolved ibuprofen, pointing to experimental testing by Mr. Fowler (plus Dr. Mazyck's own testimony that he could only speculate as to the contents of the paste below the supernatant). C2R counters that Dr. Mazyck concluded undissolved ibuprofen was *not* present in the paste, based on his visual inspection and his TCLP testing.

Third, Verde contends that Dr. Mazyck used "the wrong drug" in his aspirin testing (salicylic, not acetylsalicylic acid), making his results all the more useless and undermining support for the accuracy of the Q&A claims.

In addition, and as stated *supra* at Section F.2, the mathematical extrapolation reflected in Dr. Nowicki's calculations, as well as Dr. Mazyck's independent "testing" of the carbon in the product samples he was given, manifests that there is not enough carbon to adsorb the advertised pill capacity when using 200 mg pills. *See, e.g.*, C2R's RPMF ¶ 31 (failing to address directly Verde's statement that, according to Dr. Nowicki's analysis and assumptions, the Rx Destroyer 16 oz. product—which has a labeled capacity of 300 pills— has only 30.58 cc's of pore space, but would require 60 cc's of pore space to completely adsorb the active ingredient in 300 tablets of 200 mg ibuprofen pills, and disputing this fact because "Dr. Nowicki did not analyze 300 ibuprofen tablets of 200 mg but instead analyzed drugs of 5 mg and 30 mg pill sizes"). This is a meaningful deficit, despite testimony from the sales representative that 200 mg is "awful high," *see* Wilbert Decl. Ex. 31, primarily because 200 mg is one of the pill sizes C2R chose to advertise in its adsorption/neutralization claims. C2R, in responding to Verde's statement of proposed facts, implicitly concedes that there is not enough activated carbon in the product to adsorb/neutralize 200 mg ibuprofen pills: "Dr. Nowicki's analysis was not based on 200 mg ibuprofen pills. Even if Verde is correct that the actual pore space is lower than what Dr. Nowicki assumed, there is still sufficient pore space for adsorption of 30 mg pills." C2R's RPMF ¶ 39.

As the discussion above shows, the validity of Dr. Mazyck's testing presents a genuine issue of material fact, integrally related to whether the claims on the former Q&A webpage are literally false. The implicit concession about inadequacy of carbon, as assumed by Dr. Nowicki and supported by the math, is not wholly sufficient to conclude that the claims are literally false. Remaining unknowns, such as untested sediment from the bottom, or untested removed filtrate, and whether testing those would have brought Dr. Mazyck's results into ranges that would render the Q&A capacity claims false, cannot be

ascertained on this summary judgment record. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (at the summary judgment stage, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion). While a quantum of evidence favors Verde's position, the legal standard on summary judgment favors the nonmovant.

## CONCLUSION

In its motion for partial summary judgment, Verde asks the Court to determine, as matter of law, the meaning of several of C2R's capacity advertisements—specifically, that they clearly and unambiguously convey the message that C2R's Rx Destroyer products can deactivate the stated number of pills through activated carbon adsorption, regardless of the medication placed inside—and to conclude that those advertisements are literally false, because the Rx Destroyer products do not perform as represented.

On the record before it, the Court can grant Verde's motion on only a very limited basis. Verde has sustained its burden as to the meaning, by necessary implication, of the capacity claims in the former Q&A page of the Rx Destroyer website. Consumers reading that webpage would have understood the message that Rx Destroyer products render drugs irretrievable and unavailable for abuse solely by adsorption to activated carbon, in the stated number of pills, regardless of the medication placed inside the product, and that the words "hold" and "capacity" refer to the product's ability to neutralize/deactivate drugs through that adsorption. But because there is a material factual dispute as to the truth or falsity of the capacity claim itself, the Court cannot grant summary judgment on that element. In addition, at this state of the evidentiary record, Verde has not met its burden to establish that the other advertisements at issue (the former How to Use webpage and the one-page flyers) convey, either explicitly or through necessary implication, the capacity message(s) Verde proposes, because of ambiguity of text and lack of

context, and therefore the Court does not proceed to analyze the truth or falsity of the claimed messages therein.

## ORDER

For the foregoing reasons,

IT IS HEREBY ORDERED that Verde's motion for partial summary judgment is GRANTED in part and DENIED in part.

Dated: March 30, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge