IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

C2R Global Manufacturing, Inc.,          Case No. 18-30182-beh

Debtor.                                   Chapter 11

**DECISION AND ORDER ON C2R'S MOTION *IN LIMINE*
TO EXCLUDE CERTAIN TESTIMONY FROM JASON SUNDBY**

Verde Environmental Technologies, Inc. has designated its current CEO,
Jason Sundby, as a non-retained expert witness under Federal Rule of Civil
Procedure 26(a)(2)(C), to testify at trial in support of Verde's Lanham Act claim
against C2R. In its expert witness disclosures, Verde states that Sundby may
offer opinions on topics including, *inter alia*: (1) "customer requirements for
drug disposal devices"; (2) "the effect of misrepresentations and ineffective drug
disposal product offerings on the drug disposal market as a whole";
(3) "industry expectations for drug disposal devices"; (4) "customer reliance and
industry expectations with respect to representations about deactivation
capabilities for drug disposal devices"; and (5) "the various factors that affect
purchasing decisions in the marketplace including cost and efficacy." *See* ECF
Doc. No. 311-1 ("Piery Decl. Ex. A"), at 4.

C2R has moved to exclude Sundby's proposed testimony on these topics,
at least to the extent he intends to offer any opinions regarding "consumer
perceptions." By "consumer perceptions," the Court understands C2R to mean
consumers' mental impressions when presented with C2R's advertisements,
including how consumers are likely to interpret those advertisements, whether
the advertisements are likely to confuse or deceive consumers, and whether
consumers are likely to rely on the advertisements in making purchasing
decisions. *See, e.g.*, ECF Doc. No. 364, at 10 ("Verde seeks to use the
unsupported testimony of Sundby to take another evidentiary shortcut to meet

its burden to prove consumer deception."); *id.* at 14 ("None of these cases [cited by Verde] stand for the proposition that an industry expert is qualified through experience alone to opine on customer perceptions, including how customers interpret advertisements or make purchasing decisions."); *id.* at 15 ("Notably absent [from the bases of Sundby's opinions] is any research or study into how customers interpret C2R's advertising or considerations that affect purchasing decisions.").

C2R asserts that such testimony is not permissible as expert testimony under Federal Rule of Evidence 702 because (1) Sundby is not qualified to offer opinions on consumer perception and (2) such opinions are based on an unreliable methodology; that the opinions are inadmissible hearsay under Federal Rule of Evidence 802; and that such opinions are inadmissible as lay testimony under Federal Rule of Evidence 701.

Verde argues, in response, that C2R has requested to prohibit Sundby from testifying on a broad range of topics prematurely, "[b]ased entirely on C2R's own speculation about what opinions [Sundby] may offer at trial." ECF Doc. No. 342, at 1. But to the extent C2R has made educated guesses at the precise contours of Sundby's intended testimony, that appears to be partly because Verde has not disclosed what Sundby's opinions actually *are*. *See* Fed. R. Civ. P. 26(a)(2)(C)(ii) (for non-retained expert witnesses, a party must disclose "a summary of the facts and *opinions* to which the witness is expected to testify") (emphasis added). In its Rule 26 disclosures, rather than summarize Sundby's actual opinions, Verde recites only a list of potential *topics* on which Sundby might testify, and then "incorporates as a further summary of facts and opinions those set forth in" two other documents: (1) Sundby's February 12, 2020 deposition, and (2) Sundby's February 17, 2020 declaration in support of Verde's motion for a preliminary injunction in Adversary No. 20-2028.

Neither party has apprised the Court of any opinions disclosed in Sundby's February 12 deposition. As for Sundby's February 17 declaration, the Court reads it as expressing the following opinions relevant to this motion:

- "[C]ustomers rely and depend on drug deactivation products to actually deactivate the pills and tablets that the products are advertised as being able to deactivate."

- "[T]he drug-deactivation market as a whole is harmed by C2R's continued misrepresentations regarding the Rx Destroyer™ product capacity" because "when C2R advertises a product using activated carbon that does not work as represented, that casts doubt on all products using activated carbon" and "customers lose faith that any products are capable of deactivating medications as advertised."

- "Customers losing faith in the market and in the ability of activated carbon to deactivate medication as advertised harms Verde because both repeat and potential customers become deterred from purchasing any drug deactivation products, including Deterra."

- "Cost is a central factor in the purchasing decision and it is directly related to the capacity of the products available to the customer."

- "One of the metrics actual and prospective customers use to evaluate Verde's and C2R's products is the price per pill deactivated."

- "Because C2R substantially overstates the capacity of its products, upon comparison, it appears to consumers that C2R's Rx Destroyer™ products can deactivate a significantly higher quantity of medication at a lower 'price per pill' than Verde's Deterra system."

- "As a result"—because consumers read C2R's capacity advertisements to indicate that Rx Destroyer products deactivate medication at a lower price-per-pill than the Deterra system—"consumers choose to purchase RX Destroyer™ rather than Deterra."

*See* ECF Doc. No. 311-2 ("Piery Decl. Ex. B"), 2/17/20 Sundby Decl., ¶¶ 12, 19–21.[1]

---

[1] Sundby also offers opinions about the health and safety risks posed by undestroyed medication, including that C2R's alleged misrepresentations "pose a clear and imminent threat to public health and safety," *see id.* at ¶¶ 12–18. But because C2R has not challenged that category of opinions in its motion *in limine*, the Court does not consider their admissibility in this decision.

Given the broadly-worded topics in Verde's Rule 26 disclosures, it is possible that Sundby intends to offer additional opinions other than those identified above. C2R appears to think so, asking the Court to exclude opinions by category ("consumer perceptions"), rather than by specific opinion. But neither C2R nor the Court should have to speculate about the content of Sundby's proposed expert opinions. Verde's Rule 26 disclosures identify—by reference to Sundby's declaration—only the seven opinions listed above (at least for purposes of this motion, *see supra* n.1), so the Court will limit its discussion to those opinions.[2] For the reasons explained below, the Court will grant C2R's motion in part, and reserve ruling on the remainder of the motion until trial.

## ANALYSIS

**A.    Expert Testimony**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Together, Rule 702 and *Daubert* require a trial court to act as a "gatekeeper" and engage in a three-part analysis before admitting expert testimony, determining whether (1) the witness is qualified, (2) the methodology is reliable, and (3) the testimony is relevant, *i.e.*, it will help the trier of fact understand the evidence or determine a fact in issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

A trial judge has "'broad latitude' to determine how to evaluate expert testimony" in any particular case. *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016). That latitude is particularly broad in a bench trial, because the primary reason for the court's gatekeeping function—to ensure that unreliable expert testimony does not carry too much weight with the jury, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)—is not present. *See, e.g.*,

---

[2] If Sundby intends to offer any other opinions on the topics C2R has described as relating to "consumer perceptions," and thus within the scope of its motion *in limine*, the Court will require Verde to provide C2R with a supplemental disclosure that complies with Rule 26(a)(2)(C), as set forth later in this Order.

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010)
("[T]he usual concerns of [Rule 702]—keeping unreliable expert testimony from
the jury—are not present" in a bench trial.).

For this reason, the Seventh Circuit has observed that a trial court's
gatekeeping role is "necessarily different," and thus its Rule 702 inquiry may
vary slightly, in the case of a bench trial:

> Where the gatekeeper and the factfinder are one and the same—that is,
> the judge—the need to make such decisions prior to hearing the
> testimony is lessened. That is not to say that the scientific reliability
> requirement is lessened in such situations; the point is only that the
> court can hear the evidence and make its reliability determination
> during, rather than in advance of, trial. Thus, where the factfinder and
> the gatekeeper are the same, the court does not err in admitting the
> evidence subject to the ability later to exclude it or disregard it if it turns
> out not to meet the standard of reliability established by Rule 702.

*In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (internal citation omitted),
*disapproved of on other grounds by In re Anderson*, 917 F.3d 566 (7th Cir.
2019); *see also United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009)
("Judges . . . are less likely to be swayed by experts with insufficient
qualifications."); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)
("There is less need for the gatekeeper to keep the gate when the gatekeeper is
keeping the gate only for himself."). In other words, "the judge in a bench trial
may choose to allow the presentation of borderline testimony, subject the
testimony to the rigors of cross-examination, and decide later whether the
testimony is entitled to some consideration or whether it should be excluded as
irrelevant, unreliable, or both." *Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp.
2d 677, 682–83 (N.D. Ill. 2009).

At the same time, the Court is aware that addressing challenges to expert
opinions before, rather than during, trial will allow the parties to prepare for
trial more efficiently and ensure that valuable trial time is not spent resolving
threshold challenges to the admissibility of expert testimony. With these
considerations in mind, the Court will address C2R's two challenges to
Sundby's proposed "consumer perception" opinions under Rule 702: (1) that

Sundby is not qualified to offer such opinions, and (2) that such opinions are not based on a reliable methodology.

### 1.    Sundby's Qualifications

Verde describes Sundby as an "industry expert"—specifically, an expert in the activated carbon drug deactivation and disposal industry. ECF Doc. No. 342 at 4; ECF Doc. No. 343, ¶¶ 3 and 4. Sundby has served as the Chairman & CEO for Verde since 2015; before that, he served on Verde's board of directors for four years. ECF Doc. No. 343, ¶ 1. Sundby's educational background includes studies in journalism, mass communications, public health, and financial and enterprise risk management. ECF Doc. No 343, ¶ 2.f; ECF Doc. No. 312 ("Piery Decl. Ex. C"), Sundby Dep. at 13:9–15:15. As for his industry experience, Sundby recites the following qualifications: (1) collaboration with several regulators and governmental officials on (unspecified) initiatives related to drug deactivation and disposal (ECF Doc. No 343, ¶ 2.b); (2) market research regarding drug prescriptions, drug disposal methods, drug disposal products, and other industry and market developments affecting the drug disposal industry (*id.* at ¶ 2(c)); (3) review of information regarding different products offered by competitors in the industry, on topics including pricing, deactivation capacity, disposal instructions and guidelines, sizes and containers, service offerings concerning drug destruction, marketing strategies, and product strategies (*id.* at ¶ 2(d)); (4) review of and participation in creating competitive intelligence and sales reports (*id.* at ¶ 2(e)); and (5) hundreds of personal, first-hand observations of and interactions with participants in the industry at all levels of the supply chain over the past five years (*id.* at ¶ 2(a)).[3]

---

[3] These observations/interactions include "observations of how customers of all types respond to advertising materials and claims, such as those pertaining to cost and efficacy"; "[d]iscussions with customers of all types regarding their purchasing processes, plans, motivations/goals, and methods"; "[d]iscussions with non-profit drug prevention organizations related to finding solutions to ongoing drug epidemics, such as the opioid crisis"; and "[p]articipation in requests for proposal processes with large organizational customers and wholesalers/distributors." *Id.*

Notably, Sundby does not hold himself out to be an expert in consumer perception or behavioral linguistics—although, according to Verde, he has "extensive background" and experience in marketing and advertising. ECF Doc. No. 342, at 11.

Verde asserts that Sundby's "extensive industry experience is alone a sufficient basis for [his] opinions." ECF Doc. No. 342, at 14. That may or may not be true—it depends on the opinion being offered. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) ("Because we are not concerned with the witness's general qualifications but instead with his 'foundation for . . . answer[ing] a specific question[,] . . . we must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them.'") (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)).

C2R does not appear to attack Sundby's qualifications to testify about typical practices within the drug disposal industry. Instead, C2R asserts that Sundby does not have the required expertise to opine on issues of consumer perception, including customer reliance and customer interpretation of advertisements. *See* ECF Doc. No. 316, at 9 ("Sundby's opinions on customer reliance, customer interpretation of advertisements, and any other opinions related to customer perceptions are outside his field of expertise and should be excluded under Rule 702 and *Daubert*."). In support, C2R cites a litany of cases involving Lanham Act claims (primarily trademark and trade dress infringement) where courts have excluded expert opinions on customer perception—opinions such as what a word in an advertisement means, whether customers are (or are not) likely to be misled or confused by advertising, and whether customers would recognize a party's trade dress—when the expert was

an industry expert, but not a perception expert, and therefore did not base his or her opinion on a valid consumer survey or similar empirical data.[4]

Verde responds with several arguments. First, Verde asserts that an expert need not conduct consumer surveys or consumer market research before offering any opinions related to customer reliance or perceptions: "In false advertising cases affecting *consumers*, consumer survey evidence and market research is common, but even in those kinds of cases it is not necessary and is not dispositive." ECF Doc. No. 342, at 9 (emphasis in original). In support, Verde cites *V & S Vin & Sprit Aktiebolag v. Cracovia Brands, Inc.*, No. 01 C 9923, 2004 WL 42375, at *3 (N.D. Ill. Jan. 5, 2004). But that case is helpful to Verde only insofar as it says that "[a]ctual confusion can be shown by either direct evidence or by survey evidence." 2004 WL 42375, at

---

[4] *See LG Elecs. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3613814, at *5–6 (N.D. Ill. Sept. 3, 2010) (a technical expert with mechanical engineering expertise was not allowed to offer an opinion concerning the use of the word "steam" in consumer reference materials—which was relevant to the question of consumer deception—because "he was not an expert regarding consumer perception or linguistics, and he did not analyze how the publications used the word steam," nor did he interview any of the articles' authors and consider whether they were confused); *Hackett v. Procter & Gamble Co.*, No. 06CV2272WQH(WMC), 2008 WL 4646049, at *2 (S.D. Cal. Oct. 17, 2008) (expert with educational background in chemistry and professional experience in research and development of hair dyes was not qualified to offer opinions involving issues of consumer perception of advertising or market research); *Yeti Coolers, LLC v. RTIC Coolers, LLC*, No. A-15-CV-597-RP, 2017 WL 404553, at *1 (W.D. Tex. Jan. 27, 2017) (experts in the industry of hunting and fishing could not offer opinions about the public's perception of the plaintiff's coolers); *Starbucks Corp. v. Lundberg*, No. CV.02-948-HA, 2005 WL 6036699, at *5 (D. Or. May 25, 2005) (witness with specialized knowledge about the coffee business was not qualified to offer an opinion about likely consumer confusion between the trade dress of two coffeehouses, because she was not an expert in consumer perception or trademarks); *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, No. CV078298ABCMANX, 2010 WL 11505684, at *8 (C.D. Cal. Jan. 25, 2010), *aff'd in part*, 526 F. App'x 761 (9th Cir. 2013) (physics expert was not qualified to offer any opinions on consumer perceptions; the expert "ha[d] no background or experience in marketing or advertising and, even if he did, he relied simply on his own experience to conclude that consumers as a general matter would be misled by [the defendant's] advertising"); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 639 (S.D.N.Y. 2016), (witness who qualified as an expert in certain areas of fashion history and intellectual property law was not qualified to opine on whether consumers attributed secondary meaning to trademark; "[t]he expertise most germane to such a determination . . . involves training or experience performing empirical analyses[,] [b]ut as to this critical qualification, [the expert's] credentials are woefully deficient"); *Brighton Collectibles, Inc. v. Renaissance Grp. Int'l*, No. 06-CV-1115 H (POR), 2008 WL 5500659, at *3 (S.D. Cal. May 13, 2008) (plaintiff's president of marketing was not qualified to offer expert testimony regarding consumer perception or the likelihood of confusion between the plaintiff's and defendant's products).

*3.[5] While Verde may be correct on the law—that a consumer survey is not required to prove consumer confusion—that does not mean that Sundby's proposed opinions are admissible under Rule 702. *V & S* and other cases like it, which address the sufficiency of proof on the issue of consumer confusion, in no way suggest that an expert may offer his own opinions about likely consumer deception or consumer mental impressions in place of a properly conducted consumer survey.

Verde goes on to argue that consumer surveys and consumer market research are "even less relevant in cases such as this one, where the customers at issue are not predominantly individual consumers," but instead are organizations and institutions who make purchasing decisions through businesspeople, nurses, doctors, pharmacists, and public health professionals. According to Verde, "[t]hese customers are quite different from individual consumers; they are fewer in number, and they are inherently more difficult to survey." ECF Doc. No. 342, at 9–10. Verde provides no support for this argument. To the contrary, the importance of survey evidence has been underscored in false advertising cases where the target market is *not* the individual consumer:

> Survey evidence is the customary way of proving significant actual deception, although consumer data, market research or evidence of diverted sales (none here) may sometimes be sufficient. Common sense and personal experience alone are not enough . . [P]roof of actual or likely confusion of a significant portion of consumers [in this case, *hospitals*] requires a survey or at least some other persuasive means. The personal opinion of an expert as to what a consumer would understand is not enough.

*First Health Grp. Corp. v. United Payors & United Providers, Inc.*, 95 F. Supp. 2d 845, 848–49 (N.D. Ill. 2000), *aff'd sub nom. First Health Grp. Corp. v. BCE*

---

[5] In *V&S*, the plaintiff manufacturer moved for summary judgment on its trademark infringement claim and, as evidence of actual confusion, submitted a declaration from the COO of one of the defendant's distributors stating that he personally had confused the names of the parties' products because of their similarity; the defendant, on the other hand, offered a survey it had commissioned to show the lack of actual confusion (which the plaintiff argued actually favored its position). *Id.* The court denied summary judgment, concluding that the evidence was not enough to entitle the plaintiff to judgment as a matter of law. *Id.* at *4.

*Emergis Corp.*, 269 F.3d 800 (7th Cir. 2001); *see also Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (lack of survey evidence counted against finding actual confusion in a market where potential customers included retailers); *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 286 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) (in case where target market was professional buyers of glass chemical strengthening services, marketing expert could not offer his "qualitative" survey—which was not conducted according to accepted principles and lacked safeguards such as a control group or a sufficient number of respondents—in lieu of a properly conducted survey: "[A] survey that fails to apply an appropriate methodology is essentially nothing more than a collection of hearsay, with no indicia of reliability.").

For its second argument that consumer surveys are unnecessary to opine on consumer perception, Verde states that "the Seventh Circuit has held that an industry expert like Mr. Sundby can be qualified purely based on experience in the industry, which would inherently include interactions with industry participants," citing *Metavante*, 619 F.3d at 761. Again, this is an accurate statement of the law—an expert can be qualified based solely on experience—but the facts of *Metavante* don't stretch to fit the entirety of Sundby's proposed testimony. In *Metavante*, an external financial consultant was qualified to opine that the plaintiff, a seller of electronic banking services, had provided its services in a commercially reasonable manner, based on his personal experience in the financial sector, which included acquiring technologies on behalf of banks and negotiating servicing on behalf of technology firms. *Id.* The expert in *Metavante* may have been qualified to testify about typical practices within the financial industry—and whether *he considered* certain conduct to have met a standard of care—but his expertise would not have qualified him to measure the perceptions or interpretive reactions of others.

Verde goes on to say that other courts "have held that testimony akin to that offered by Mr. Sundby is admissible in false advertising cases," likening Sundby's testimony to that of a "dealer, distributor, or customer on the actual deception issue," and citing *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982) and *Criticare Sys., Inc. v. Nellcor Inc.*, 856 F. Supp. 495, 507 (E.D. Wis. 1994). But like the *V & S* case discussed above, those cases do not involve the admissibility of expert testimony, and instead only support the general proposition that testimony of consumers in the target market about their *own* deception may be admissible as direct evidence of consumer confusion.[6] For similar reasons, Verde's reliance on *Grove Fresh Distribs., Inc. v. New England Apple Prod. Co.*, 969 F.2d 552, 557 (7th Cir. 1992) is unhelpful. In *Grove Fresh*, the court considered whether there was sufficient evidence to find a causal link between the advertisement at issue and the plaintiff's damages—not the admissibility of evidence, under Rule 702 or otherwise.

Based on the record before it, the Court is not satisfied that Sundby is qualified to offer opinions on consumer perceptions—opinions typically offered by experts with training and experience in conducting and interpreting consumer surveys. Included in this category are at least two specific opinions Verde has disclosed:

- "Because C2R substantially overstates the capacity of its products, upon comparison, it appears to consumers that C2R's Rx Destroyer™ products can deactivate a significantly higher quantity of medication at a lower 'price per pill' than Verde's Deterra system." Piery Decl. Ex. B, ¶ 21.

---

[6] For example, in *Schutt*, the Seventh Circuit stated that a plaintiff may demonstrate actual consumer reliance on misleading statements "not only by evidence of actual diversion of sales, but also by such proof of actual customer deception as surveys, . . . or testimony of a dealer, distributor, or customer on the actual deception issue," citing *Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 254 n.25 (D. Del. 1980) for the latter proposition. In *Toro*, the district court concluded that the plaintiff manufacturer had failed to provide sufficient evidence of actual reliance, noting: "There is no evidence that any consumer, dealer or distributor [i.e., the target purchasing market] relied on the Jacobsen advertisement, much less upon the particular claims I have found to be false, to Toro's detriment," which was fatal to the plaintiff's claim for damages. 499 F. Supp. 241 at 254. The court added in footnote: "No distributor, dealer or customer testified about his own false impression and there were no relevant survey studies. While several market research and consumer perception studies were introduced into evidence, none dealt with the impact of the challenged claims on the target group." *Id.* at n.25.

- "As a result"—because consumers interpret C2R's advertisements to mean that the Rx Destroyer products have the capacity to deactivate medication at a lower price-per-pill than the Deterra system— "consumers choose to purchase Rx Destroyer™ rather than Deterra." *Id.*

Necessary to these opinions are the assumptions that (1) consumers in general would interpret "capacity" in C2R's advertisements to mean "capacity to deactivate," and (2) C2R's advertisements would have an effect on consumers' intent to purchase C2R's products. Both of these assumptions involve predictions about a consumer's thoughts and impressions after reviewing C2R's advertisements—in other words, how consumers perceive the statements at issue in this litigation.

While Sundby may be qualified to testify about the drug disposal industry in general, his industry experience does not render him an expert in false advertising or consumer perception of advertisements. *See, e.g.*, *Sassafras Enters., Inc. v. Roshco, Inc.*, 915 F. Supp. 1, 8 (N.D. Ill. 1996) (plaintiff's sales representative was unqualified to offer opinion on whether plaintiff's trade dress had obtained secondary meaning in the mind of purchasers: "Michalek's business experience might perhaps qualify him as an 'expert' under Fed. R. Evid. 702 on some matters having to do with pizza stones . . . , but there is surely nothing to suggest his qualifications as a mindreader. Simply put, he has not been shown to be capable of testifying as to the mental reactions that *other* persons would have on seeing [defendant] Roshco's product."); *Out RAGE, LLC v. New Archery Prod. Corp.*, No. 11-CV-701-BBC, 2013 WL 12234188, at *8 (W.D. Wis. June 25, 2013) (expert's extensive experience in the bowhunting industry was an insufficient basis for his opinion about the likelihood of consumer confusion from the use of the term "kill zone" in advertising; expert was, however, qualified to offer helpful testimony about the meaning of the term "kill zone" in the bow-hunting community and the history of the broadhead arrowhead industry).

As for Sundby's other opinions (at least the five disclosed in his February 17 declaration), the Court reads them as drawing conclusions *not* about

consumer perceptions of C2R's advertisements, but instead about the effect of false advertising on the drug deactivation market in general (and Verde in particular),[7] and product features relevant to customer purchasing decisions.[8] Sundby's lack of expertise in consumer perceptions or behavioral linguistics is not, by itself, a reason to exclude these additional opinions.

### 2.    Reliability

The objective of Rule 702 is to ensure the reliability of an expert's testimony—"to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). This requires the trial judge to ensure that "the expert is using a valid methodology (scientific or otherwise), that there is sufficient data to justify the use of the methodology in the particular case, and that the expert applied the methodology appropriately." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013). In short, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003).

Verde asserts that, because industry expertise is primarily based on experience, Sundby's personal experience is a sufficient basis for his opinions.

---

[7] *See* Piery Decl. Ex. B, ¶ 19 ("[T]he drug-deactivation market as a whole is harmed by C2R's continued misrepresentations regarding the RX Destroyer™ product capacity" because "when C2R advertises a product using activated carbon that does not work as represented, that casts doubt on all products using activated carbon" and "customers lose faith that any products are capable of deactivating medications as advertised."); *id.* at ¶ 20 ("Customers losing faith in the market and in the ability of activated carbon to deactivate medication as advertised harms Verde because both repeat and potential customers become deterred from purchasing any drug deactivation products, including Deterra."). Of course, Sundby is not qualified to opine that C2R's advertising statements are false or that C2R's products do not work as advertised, but the Court understands that Verde is not offering Sundby for this purpose.

[8] *See id.* at ¶ 12 ("[C]ustomers rely and depend on drug deactivation products to actually deactivate the pills and tablets that the products are advertised as being able to deactivate."); *id.* at ¶ 21 ("Cost is a central factor in the purchasing decision and it is directly related to the capacity of the products available to the customer. One of the metrics actual and prospective customers use to evaluate Verde's and C2R's products is the price per pill deactivated.").

While that may be true for opinions about norms and practices in the drug disposal industry, it does not apply to opinions about the mental perceptions of others. As previously noted, the customary methodology for ascertaining issues of consumer perception is survey evidence. According to a leading treatise on trademarks and unfair competition, in discussing the closely analogous situation of consumer confusion in trademark infringement, there is a reason for the primacy of survey evidence:

> At the trial level, the issue of likelihood of confusion is an issue of fact. Most courts will not allow the expert testimony of a witness who opines on the ultimate question of whether there is or is not a likelihood of confusion. For example, most courts will not allow a jury to hear a witness testify that: "I've been an executive in the Gizmo industry for over twenty years, and in my opinion, defendant's use of the accused trademark Abba will probably confuse customers into thinking they are the goods of plaintiff Alfa."

> The reason that such testimony is usually not proper is *not* that the witness is testifying as to a conclusion of law, but that the witness has no expertise and no factual basis to opine as to the probable state of mind of customers when presented with the conflicting marks. A survey expert has conducted a scientific test and asked questions of potential buyers: other experts have not.

> The usual and accepted method of admitting expert testimony on the ultimate factual issue of likelihood of confusion is for the expert to design and have conducted a survey of customers of that product or service. The expert who has not conducted such a survey must articulate and describe some other reliable methodology that forms the basis for the conclusion that confusion is or is not likely in this case.

4 McCarthy on Trademarks and Unfair Competition § 23:2.75 (5th ed.); *see also Tovey v. Nike, Inc.*, No. 1:12CV448, 2014 WL 3510636, at *5 (N.D. Ohio July 10, 2014) (granting motion to exclude expert testimony on the ultimate issue of likelihood of confusion because the witness failed to disclose any reliable methodology beyond a personal opinion as to whether there would be confusion caused by two marks; the expert's failure to conduct a survey due to "cost containment" issues was not a sufficient justification for the alternate choice of methodology).

For example, in *Yeti Coolers* (a trade dress infringement case), experts in the hunting and fishing industry proposed to offer opinions regarding the public's perceptions of the plaintiff's coolers. One of the experts intended to testify that "people in the industry can determine that a Tundra® and Roadie® cooler is a YETI just by viewing the overall design and [appearance] of the coolers. . . . When individuals in the hunting industry see overall design and appearance of those coolers, they think of one company, and that company is YETI." 2017 WL 404553, at *1. The court observed that this testimony was not based on any data, surveys, or other empirical evidence, but instead was "simply what [the expert] thinks and what he has heard others say, based on his experience as an outdoor writer, speaker and hunting guide." *Id.* The court excluded the testimony, observing that "opinion evidence that is based solely on anecdotal evidence and conversations is not admissible as expert testimony," and pointed out that the experts' industry qualifications were not a replacement for hard data:

> [T]hese witnesses' experience is in hunting and fishing, which only qualifies them to opine on topics such as the quality of fly rods, which shotgun is the best, or the premium location for hunting deer with a bow. It does not qualify them as experts on whether a product is "famous" for trade dress purposes, whether the general consuming public recognizes a product as iconic, or whether a product's appearance has obtained secondary meaning; or at least it does not qualify them to offer those opinions without gathering evidence to support it through a process recognized as accurate and accepted (*e.g.,* a double blind survey of a scientifically significant sample of consumers).

*Id.* The court also refused to allow the witnesses to offer the same testimony as lay opinion testimony under Rule 701, explaining:

> [T]he relevant issue here is the *perception* of consumers. The only way to gauge this is by gathering information from the general consuming public in a scientific way that allows one to make reasonable conclusions regarding consumers' thoughts about a product. Simply spending a great deal of time interacting with users of a product is not a substitute for empirical data. If it were, then every trademark case would be supportable merely by lay witnesses—users of the contested product or people who interact with them. Because the proposed lay testimony

would not be based on reliable data, it would be irrelevant, and should not be permitted.

*Id.* at *2 (emphasis in original).

Similarly, in *Deere & Co. v. FIMCO Inc.*, 239 F. Supp. 3d 964 (W.D. Ky. 2017) (trademark infringement), the defendant's non-retained experts intended to provide a number of opinions, including: (1) "[t]here is no actual or likely confusion by U.S. consumers as to the identity of the manufacturer of [the defendant] FIMCO's agricultural equipment products"; and (2) "U.S. consumers of agricultural equipment are not deceived into believing that FIMCO's products are sponsored by, approved by, or otherwise affiliated with [plaintiff] Deere & Co." *Id.* at 982–84. The experts disclosed that their opinions were based upon their "training, background, and experience," "consumer interactions," and, for some, their "own farming experience." *Id.* at 983. The court concluded that these opinions were inadmissible, explaining:

> Here, the Court is unpersuaded that FIMCO's witnesses have articulated such reliable methodologies sufficient to offer the blanket opinions that "[t]here is no actual or likely confusion by U.S. consumers." In his deposition, for example, Yeazel testified that he based this opinion on "many years talking to people about FIMCO equipment, its color being green and yellow, and them never coming in and saying, 'Is that a John Deere?'" . . . Similarly, Schwarz testified that his "opinion is there is none and I have no experience of any confusion." . . . Staack testified that "there is no confusion in my mind, my opinion, . . . I've never been asked by—nobody has ever come into one of my booths and asked is this a John Deere sprayer." . . . To be clear, the witnesses can certainly testify regarding their *own* experiences with their customers throughout their careers. However, without more, the Court cannot say that the witnesses used "some other reliable methodology" sufficient to testify that no likelihood of confusion exists in this case among all U.S. customers. . . . Although the experts can testify as to their own experiences with customers, their opinions as to the existence of actual or likely confusion as to all U.S. consumers are improper. . . .

> The Court finds this reasoning equally applicable to the witnesses' opinions that "U.S. consumers of agricultural equipment are not deceived

into believing that FIMCO's products are sponsored by, approved by, or otherwise affiliated with Deere & Co."

*Id.* at 983–84 (emphasis in original).[9]

Like the experts in *Deere*, Sundby can testify about his own experiences with customers over the years—provided such testimony is not inadmissible for other reasons—but Verde has not persuaded the Court that any opinions Sundby intends to offer about the likely thoughts or perceptions of Verde's target consumers are sufficiently reliable to be admitted. To the extent Sundby intends to rely on his "industry experience" rather than a consumer survey to opine on likely consumer perceptions—and, more particularly, that consumers in general would interpret "capacity" in C2R's advertisements to mean "capacity to deactivate" and, as a result, would be more inclined to purchase C2R's products over the competition, *see* Piery Decl. Ex. B, ¶ 21—Sundby has not adequately explained why his chosen methodology (apparently based on experience including conversations with others in the industry) is appropriate

---

[9] In contrast, the *Deere & Co.* court found the following opinions to be permissible: (1) "[p]urchasers of large agricultural equipment are knowledgeable about the equipment they intend to purchase and are sophisticated consumers who take great care to do research before purchasing in order to understand the features and price of the competing equipment they plan to purchase"; (2) "[m]any manufacturers use the colors green and yellow on agricultural equipment sold in the United States, and those colors are not solely identified with Deere & Co." (the court found this testimony reliable because "the witnesses were able, during depositions, to support their statements by identifying other manufacturers who use green and yellow"); (3) "[i]n the U.S. market, a new self-propelled agricultural sprayer does not compete with a new trailed sprayer" (the court rejected the plaintiff's argument that this testimony lacked a proper basis, noting that one of the experts testified that he based this opinion on price differences); (4) "if a purchaser owns a John Deere tractor or agricultural vehicle, the colors green and yellow become extremely important to the purchase decision because such consumers desire to match or complement their trailed agricultural equipment to their John Deere tractor or agricultural vehicle" (the court concluded that this opinion was reliable, based on testimony from the witnesses about their experiences of the customer buying process, including an encounter with one customer who had a red tractor and wanted a red sprayer to match); and (5) "[b]ecause John Deere has a large share of the U.S. tractor and agricultural vehicle market, under these circumstances, it would be a substantial competitive disadvantage for FIMCO to not be able to offer its products in green and yellow" (the court found the opinion sufficiently reliable because, during the witnesses' depositions, they each supported it "with some variation of the statement that, because farmers want to match their agricultural equipment to their tractors, if they were not able to offer green and yellow equipment, they fear they would lose sales"). *Id.* at 984–85.

or reliable. The Court therefore will grant C2R's motion to exclude Sundby's opinions on these issues.

To be clear, this does not mean that Sundby is prohibited from offering testimony on subsidiary factual issues relevant to the question of deception, such as typical advertising and marketing channels in the industry, the types of consumers in the target market, the sales process, and other circumstances helpful to providing a full context for the advertising at issue—provided that Sundby is able to lay a proper foundation for such testimony at trial.

For the same reasons, the Court will not exclude Sundby's proposed opinions on the effect of false advertising on the drug deactivation market, *see* Piery Decl. Ex. B, ¶¶ 19–20, or product features relevant to customer purchasing decisions, *see id.* at ¶¶ 12 and 21—at least at this point in time. Following the Seventh Circuit's guidance in *Salem*, the Court instead will allow Sundby the opportunity to explain at trial why he reached these particular conclusions, on the basis of a reasoned application of his specialized knowledge and experience to the facts or data on which he relied—subject to vigorous cross-examination from C2R—before determining what weight, if any, to afford this opinion testimony under Rule 702.

## B. Hearsay

C2R also argues that Sundby's proposed opinions impermissibly parrot hearsay statements. Without knowing the specific factual bases of Sundby's proposed opinions, the Court cannot determine at this point whether any are, in fact, based or rely on hearsay statements. To the extent the Court has not concluded above that Sundby's particular opinions are inadmissible, the Court will reserve ruling on any hearsay objections until specific testimony is offered, and objected to, at trial.

## C. Lay Testimony

Finally, C2R argues that Sundby cannot offer his proposed opinions as "lay opinion" testimony under Federal Rule of Evidence 701. Rule 701 allows a lay witness to offer opinion testimony, provided that the opinion is

"(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

The limitation that a lay witness opinion be based on factual information the witness *personally perceived* is merely a restatement of the traditional requirement that witness testimony be based on personal knowledge, *see* Fed. R. Evid. 602, as opposed to expert opinions, which may be derived from information—even inadmissible information—that the expert did not personally perceive, but was made aware of before trial, *see* Fed. R. Evid. 703. Relatedly, the exclusion of lay testimony that is based on specialized knowledge is intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. . . . [A] witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 advisory committee's note to 2000 amendment.

C2R says that Sundby's proposed opinions do not meet the requirements of Rule 701, because they are based not on Sundby's personal knowledge, but on specialized knowledge, and are of the type traditionally offered by experts. As Verde concedes in its expert disclosures, Sundby purports to have obtained, through his industry experience, "extensive understanding and *specialized knowledge* of what customers typically expect and rely on with respect to drug disposal products." Piery Decl. Ex. A, at 4 (emphasis added).

In response, Verde asserts that Sundby meets the personal-perception requirement of Rule 701 and may offer lay opinions about "customer requirements for drug disposal devices, the effect of misrepresentations and ineffective drug disposal product offerings on the market as a whole, the various factors that affect purchasing decisions in the marketplace, and more,"

because these opinions "fall within the scope of his perception given his many observations of industry customs and behavior." ECF Doc. No. 342, at 17; *see also id.* at 16 (". . . Mr. Sundby may offer lay opinions based on his observations about industry customs and behavior, which are 'rationally based on [his] perception' as a highly-engaged person in that industry. Fed. R. Evid. 701(a).").

Whether Verde is correct depends on the precise opinion to be offered. If, for example, Verde means to suggest that Sundby may offer the opinions discussed above under Rule 701, rather than Rule 702, that is incorrect. Such testimony—in which Sundby purports to rely not only on his personal observations of specific customers, but also on the application of his specialized knowledge and experience, to draw general inferences about the target consumer population as a whole—is (1) not based solely on Sundby's personal knowledge, and (2) could be offered by *anyone* with specialized knowledge of the drug disposal industry, which makes it expert, rather than lay, testimony. *See, e.g., Plyler v. Whirlpool Corp.*, 751 F.3d 509, 514 (7th Cir. 2014) (plaintiff in negligence action could testify under Rule 701 about his observations of fire and its aftermath, but not his interpretation of those observations, nor could he draw inferences about fire's origin, which required specialized knowledge); *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (ATF agent's testimony that the defendant's firearms were not collector's items, which was based on his training and experience as an agent, was expert opinion testimony rather than lay opinion testimony; testimony of this nature "could have been offered by any individual with specialized knowledge of the collector's market in firearms" and "did not have to be offered by one of the investigating agents"); *see also United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) ("[A] lay witness is permitted to base his testimony on his personal knowledge (and on nothing else).").

Lay opinion testimony concerning the likely thoughts or reactions of others is particularly problematic. In *Fenzl*, for example, the prosecution

offered the "lay opinion" testimony of a city investigator to establish that the City of Chicago's Department of Procurement would not have awarded the defendant's company a contract had it known of the defendant's "behind the scenes" communications with other bidders during the bidding process. 670 F.3d at 781. Rather than call any employees of the Department of Procurement to testify about what they would have done had they known about the defendant's machinations, the prosecutors relied solely on the city investigator's opinion that the Department would have disqualified the company from bidding had it known about the defendant's activity. *Id.* at 782. The Seventh Circuit concluded that the district court erred in admitting this testimony, which was "hearsay of a peculiarly unreliable sort," because the investigator was "part of the prosecution team, testifying to impressions gleaned from discussions and observations," and "was not even repeating what someone had told him, but rather was drawing inferences from stray comments and from things he'd learned in previous investigations." *Id.* The court observed: "[I]t is a matter of conjecture whether the relevant employees in the Department would have awarded the contract . . . . But instead of asking them what they would have done had they known what [the defendant] was up to, the prosecutors asked an investigator what he thought they would have done. What the government dignified by the term 'personal knowledge' . . . is the investigator's conjectures based on seven years of 'training and experience,' an impermissible basis for lay opinion testimony." *Id.*

Like the investigator in *Fenzl*, Sundby lacks the requisite personal knowledge to testify about what potential customers might or might not have done had they known of the alleged falsity of C2R's advertising statements. Such conjectures are not testimony about what Sundby actually *did* perceive, but instead speculation about what he *might* perceive under different circumstances or in hypothetical scenarios, and thus are beyond the scope of Rule 701. *See also Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d 200, 203–204 (4th Cir. 2000) (court erred in permitting lay witness to testify in form

of responses to hypothetical or like questions that required specialized knowledge to answer); *Tyco Healthcare Grp. LP v. Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 131 (D. Mass. 2006) (finding that "[l]ay opinion of consumers' mental impressions is problematic" and striking statements from affidavit of defendant's director of marketing that the layout of stores prevents consumer confusion and that consumers tend to act with care in considering the type of goods sold by the parties, because "[m]eaningful opinion about consumer impressions requires some scientific, technical, or statistical basis in fact").

Verde asserts that "[c]ourts routinely permit businesspersons to offer testimony concerning confusion and injury based on their observations," citing *Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, No. 09-CV-99-JPS, 2011 WL 4478440, at *7–9 (E.D. Wis. Sept. 23, 2011); *MGE UPS Sys., Inc. v. Fakouri Elec. Eng'g, Inc.*, No. 4:04-CV-445-Y, 2006 WL 680513, at *4–5 (N.D. Tex. Mar. 14, 2006); and *Newport Electronics, Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 208-09 (D. Conn. 2001). But those cases are distinguishable. In *Quad/Graphics*, the court rejected the plaintiff's argument that the defendant's chief operating officer did not have sufficient personal knowledge to offer lay opinion testimony about the volume of business the defendant expected from potential sales leads, as well as the anticipated closing rate on those sales leads, because the COO's testimony established that he was personally involved in the sales side of the business and based his closing rate opinion on the defendant's actual historical closing percentage, of which he had personal knowledge given his position. 2011 WL 4478440, at *8. In *MGE UPS Sys.*, the court admitted various declarations after concluding that the challenged statements were either based on the witnesses' personal knowledge, or opinions rationally based on the witness's perceptions—not any specialized knowledge. 2006 WL 680513, at *4. And in *Newport*, the defendant's president was permitted to testify to the *actual* confusion that he and his company experienced because that was within his personal knowledge and stemmed from his own experience. 157 F. Supp. 2d at 208–09.

None of these cases support the notion that Sundby can offer lay opinion testimony about the likely confusion or deception of potential customers or the likely effect of C2R's advertising statements on potential customers—including whether such statements resulted in lost business to Verde (i.e., that customers who purchased from C2R would have purchased from Verde but-for the falsity of C2R's advertising). Such testimony would exceed the scope of Sundby's personal perceptions, and therefore enter the territory of expert opinions, subject to the requirements of Rule 702.

## CONCLUSION

On the record before it, the Court is not satisfied that Mr. Sundby's experience in the drug disposal and deactivation industry qualifies him to offer reliable expert testimony on consumer perceptions—specifically, to offer the opinions that (1) consumers in general interpret C2R's advertisements about capacity to mean capacity to deactivate (so "it appears to consumers that C2R's Rx Destroyer™ products can deactivate a significantly higher quantity of medication at a lower 'price per pill' than Verde's Deterra system"); and (2) because consumers read C2R's capacity advertisements to indicate that Rx Destroyer products deactivate medication at a lower price-per-pill than Deterra, "consumers choose to purchase RX Destroyer™ rather than Deterra." Piery Decl. Ex. B, ¶ 21. The Court therefore will grant C2R's motion *in limine* in part, and preclude Sundby from offering these opinions at trial.

By precluding Sundby from opining on consumer perceptions, however, the Court is not prohibiting Sundby from testifying about specific examples of consumer deception that he has witnessed, or from offering testimony on subsidiary questions of fact, such as characteristics and makeup of the drug disposal industry and the target market, the products offered and whether they compete in the market, and considerations relevant to customer purchasing decisions—provided that Sundby is able to lay the foundation for such testimony at trial. For these reasons, the Court will reserve ruling on the admissibility of the other opinions disclosed in Sundby's February 17

declaration (those concerning market harm and factors relevant to purchasing decisions).

**ORDER**

For the foregoing reasons,

IT IS THEREFORE ORDERED that C2R's motion to exclude certain testimony from Jason Sundby is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that, if Mr. Sundby intends to offer any other opinions on "consumer perception" that have not been specifically disclosed to C2R, Verde must provide C2R with a supplemental Rule 26 disclosure, which summarizes the actual opinion(s) Sundby intends to offer, *see* Fed. R. Civ. P. 26(a)(2)(C)(ii), within **14 DAYS** from the date of this Order. Any such opinions that Verde fails to disclose may be subject to exclusion at trial under Federal Rule of Civil Procedure 37(c)(1).

Dated: March 30, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge